MENKE v. FIRST NAT. BANK OF AMARILLO. (No. 1395.)

(Court of Civil Appeals of Texas. Amarillo. Oct. 30, 1918. Rehearing Denied Nov. 27, 1918.)

1. SALES ☞202(1), 234(8)—PASSAGE OF TITLE—PAYMENT ON DELIVERY.

Where the terms of a sale of personal property are cash on delivery, concurrent payment upon ·delivery is essential to pass title, and in the absence of an estoppel the vendor may retake the property in the hands of an innocent subvendee for value.

2. SALES ☞465—CONDITIONAL SALES — NECESSITY OF FILING.

Where a sale is conditional, in that title is to pass, not upon delivery of the property, but upon subsequent payment, in order to affect subsequent purchasers or creditors, it must be filed as a chattel mortgage, under article 5654, Rev. St.

3. SALES ☞196 — WAIVER OF PAYMENT ON DELIVERY—EVIDENCE.

In an action against a bank to recover on account of wheat sold, facts *held* to show that plaintiff, in making bill of lading, waived payment on delivery, and established the relation of debtor and creditor between himself and the immediate purchaser.

4. SALES ☞219(3)—RIGHTS OF THIRD PERSONS.

Where an owner of wheat sells it,· and by waiving immediate payment makes the purchaser a bailee, with authority to dispose of the wheat and its proceeds, a bank, cashing the purchaser's checks and crediting his account with amount of a draft attached to a bill of lading, is protected as against the seller.

Appeal from District Court, Potter County; Hugh L. Umphres, Judge.

Action by Dietrich Menke against the First National Bank of Amarillo. Judgment for defendant, and plaintiff appeals. Affirmed.

Madden, Trulove, ;Ryburn & Pipkin and F. A. Cooper, all of Amarillo, for appellant.

Kimbrough, Underwood & Jackson, of Amarillo, for appellee.

HUFF, C. J. The pleadings in this case are voluminous and will not be set out, as we think the issue raised may be determined by a statement of the facts. Grover C. Bishop was in the grain business in Amarillo during the year 1916, doing his banking with the appellee bank. The general method or custom in handling grain, as testified to by Bishop, was:

"If I bought a car from other dealers, a bill of lading came in here. I would give check on the First National Bank of Amarillo, take up the draft, and make redeposit. * * * That was just a matter of giving check on the bank and redepositing draft on the car of wheat or grain, as the case might be. They were all handled that way from time to time prior to October 11, 1916. When I purchased from the farmer, I would give him a check for it; then I would bill car out immediately and take bill of lading in and deposit to my credit; that is, to cover· the amount of the check . which I had given against the particular car of grain, if I needed it. * * * In redepositing these drafts with bill of lading attached here in the First National Bank, I usually and customarily showed myself consignor. Everything was shipper's order; that is the customary way of handling outbound grain drafts by grain men."

He further stated that it did not occur often that the check given to the farmers would reach the bank before the draft and bill of lading was deposited, but when it did the bank called his attention to the matter and he would tell them what he had to cover the check and the bank would carry it. The facts show that, when Bishop bought and shipped grain, he would deposit draft and bill of lading attached, drawing against parties to whom he was shipping. He had a regular running account with the bank, and would deposit his drafts, which would be credited on his account, and he would check on his account as any other ordinary banking account. The bank would honor Bishop's checks against it before it had received returns on the draft. The draft so drawn was taken by the bank, and Bishop was given credit on his account for the amount, subject to the payment of the draft. The bank paid his checks for any amount that he had to his credit, including the credit covered by the drafts which he had deposited. This was the general method of transacting business by Bishop through appellee bank. In August, 1916, appellant, Menke, contracted to sell to Bishop 1,000 bushels of wheat, which was grown on land belonging to the estate of appellant's deceased brother, which appellant farmed under a rental contract, by the terms of which he paid one-half of the crop. His brother left six children,

three of whom were minors, for whom appellant was guardian, and he sues in this case for himself and as guardian of the minor children. Both Menke and Bishop testified the sale of the wheat was by oral contract and was a cash transaction. Appellant, however, introduced in evidence the following instrument, which the testimony shows was in duplicate, one of which was kept by Menke and the other by Bishop:

"Grover C. Bishop, Wholesale Grain and Hay.

"Contract of Purchase.

"Amarillo, Texas, August 26, 1916.

"Dick Menke, Soncy, Texas:

"We hereby confirm purchase from you to-day as follows:

"Quantity: 1,000 bushels.

"Grain: Number 2 hard winter milling wheat.

"Price: $1.50.

"Basis: F. O. B. Soncy.

"Shipment: Next week.

"Route: Mine.

"To be Billed: S. O.

"Destination:

"Terms: Demand.

"Weights: Destination.

"Grades: Destination.

"It is distinctly agreed between us that this contract is subject to all the rules and regulations and customs of Texas Grain Dealers' Association, and that said rules and regulations shall be binding on both parties to this contract. It is also agreed that this confirmation is a part of the contract and its acceptance by you without notifying us by wire of error is acknowledgment of contract as set forth above.

"Remarks: * * *

"Yours truly,          Grover C. Bishop,

"By [Signed] Dick Menke.

"(Duplicate.)"

Immediately thereafter Menke began loading the wheat in a car on the siding on the Chicago, Rock Island & Gulf Railway Company, and finished loading about the 30th day of August. The next day after loading he went in to see Bishop and told him the car was loaded. Nothing further passed, except Bishop told him he wanted to have the car taken out; but Menke says it stood there three or four days after. Menke saw the car when it was moved by the railroad company, and knew that it moved about the 5th of September. There was no railroad agent at Soncy, the siding where the car was loaded. Bishop told him, after he moved the car, that he had procured bill of lading for the car, and appellant also saw copy of the bill of lading. It appears that, when appellant first reported to Bishop about the loading of the car, he showed him a memorandum, presumably of the weight; but Bishop told him there was a mistake, or that it was incorrect. Appellant at that time did not ask for a check or payment. Appellant admits that he was not in to see Bishop earlier than the 19th, after loading, for the reason that he did not have time, and on the 19th he asked Bishop if he had the returns on the car, at which time Bishop said he did not have time then and left his office. The next time Menke saw Bishop he asked Bishop for the money. The time apparently fixed for this conversation was about the 24th or 26th of September, and with reference to the conversation had Menke testified:

"He [Bishop] said: 'I will hold the money for you. You are in bad shape to take that money.' And I say: 'I can carry that money in my pocket.' That is what I told him. I says: 'I can carry that money in my pocket.' And then he says: 'Well, you need that money, and it is not safe to carry that way. I will hold that money for you.' And I say: 'I can take that money, but if it is not safe, and if it is safe for you to hold it, you can keep it until I have paid off that land.' Bishop said: 'It is safe.' "

Appellant then left Bishop. From the evidence it appears some time prior to this transaction Menke had entered into a contract with a Mr. Ridgway to purchase some land, and had placed up his check with the contract in the bank for $1,500. He desired to cancel this contract, and did not want to carry it out. He spoke to Mr. Fuqua, the president of the bank, about the matter somewhere near the time of this last conversation with Bishop, who it appears told Menke, if he should place the money in the bank, it would likely be applied on the check in the land transaction. This land contract was afterwards rescinded, it appears from the evidence. After this last conversation with Bishop, some one appears to have warned Menke that he should get his money from Bishop, and on the 7th of October he demanded his money from Bishop, and on that day Bishop issued his check on the bank for $1,500 payable to the order of Menke. This was after banking hours and about 5 or 6 o'clock in the afternoon; however, Menke went to the bank and entered at the side door, he does not appear to have presented the check for payment or deposit, but only remarked that he reckoned it was too late to deposit, and the vice president replied that it was a little late. We infer from the evidence, which is rather indefinite, that the officers knew whose check it was that Menke had. The 7th was Saturday. Menke did not again present the check until the 11th of October, at which time the bank informed Menke that it would not pay Bishop's checks, and the vice president said they could not have paid it on the 7th, or that Bishop did not have any money at that time. It appears that the bank on the 11th had refused to pay any more of Bishop's checks. In the clearance for the day before it had gotten checks through the Amarillo National Bank, drawn on appellee by Bishop, and perhaps other checks, and refused to pay because of lack of funds, and suspended payment of his checks on the 11th.

Bishop, on September 5th, procured from the railroad company an order bill of lading for a car of wheat said to weigh 73,000 pounds, consigned to the order of Grover C. Bishop, destination, Ft. Worth, Tex., and to

notify Douglas W. King, Ft. Worth, Tex. At the same time he drew on Douglas W. King for $1,889, in favor of appellee bank, and attached it to the bill of lading and delivered it to the bank. The bank gave him credit for the draft and forwarded it to its correspondent at Ft. Worth, Tex., and gave Bishop's current checking account credit for the amount of the draft. King, upon presentation to him, refused to accept, because the wheat was sent to him on consignment, and he refused to pay for wheat on consignment. After protest, Bishop directed the bank to return the draft, which it did, and the draft was paid on presentation September 9th. This draft is covered by King's check for $4,985, covering two other cars of wheat, for which appellee bank was given credit by its correspondent at Ft. Worth. The evidence shows that Bishop checked continuously on the bank and upon his account, and that both on the 7th and 11th of October he had a small balance to his credit; a little over $10 on one day and only a small amount on the other. On neither day had he sufficient to pay the check, and but a small or fractional part of it. It appears he had issued other checks against his account, which could not be paid on account of insufficient funds, and these were presented to the bank before appellant presented his check. The evidence is perhaps sufficient to show that the bank, about the middle of September, had notice that Menke had sold his wheat to Bishop; but there was nothing on the bill of lading or draft to evidence that the wheat called for therein was the wheat Menke sold. The draft had been placed to the credit of Bishop, and paid, before the evidence shows the bank had any notice of the sale to Bishop.

The appellant alleged that the bank had applied the proceeds of the wheat to a preexisting debt owing it by Bishop. There are no facts from which a jury could have drawn any such inference. If Bishop bought grain and desired to hold it, he usually made arrangements to carry through the bank, by giving his note and a mortgage on the particular grain, which upon sale his obligation therefor was discharged. There was an effort made to show pre-existing debts were paid by the wheat, but our conclusion of the facts is no jury would have been justified in so finding from the evidence. This particular wheat was handled through the bank in the usual and customary way first set out by us in this statement, except Bishop did not give to the farmer his check before or at the time of billing the car, as it appears from his testimony to have been the custom. At the conclusion of the evidence the trial court directed a verdict for the appellee.

[1] The first assignment is to the effect that the evidence was sufficient to authorize the jury to find that the sale was a cash transaction and that Menke had not parted with the title. Perhaps the testimony of Bishop and Menke would justify the jury so to find. As we understand the rule, where the terms are cash on delivery, if such was the contract, the concurrent payment upon delivery was essential to pass title, and if there was nothing in the transaction which would create an equitable estoppel against the vendor, he may take the property in the hands of an innocent subvendee for value. Johnson v. Central Bank, 116 Mo. 558, 22 S. W. 813, 38 Am. St. Rep. 615; National Bank of Commerce v. C. B. & N. R. Co., 44 Minn. 224, 46 N. W. 342, 560, 9 L. R. A. 263, 20 Am. St. Rep. 566; Farmers' National Bank v. Henderson, 29 S. W. 562; Lang v. Rickmers, 70 Tex. 108, 7 S. W. 529. In the two cases first cited the vendor gave his checks on or before delivery, which were not paid, and the banks therein applied the proceeds of the property sold to a pre-existing debt. In such case it was held the vendor could recover. Such in effect is the holding of Davis v. Bank, 29 S. W. 926, and Commercial Bank v. Jones, 18 Tex. 821. In this case, however, while appellant and Bishop both testified the contract was oral and was a cash transaction, appellant shows and proves it was a sale on credit and that the contract was in writing. He introduced a written contract, which he signed, which stipulates that the terms of the sale were upon demand, weight and grade at destination. There is no pleading that this contract was signed through fraud or mistake, and none is proven; but, on the contrary, it is shown, after signing the contract, appellant loaded the car, notified Bishop of the fact, assented to his shipping the wheat in his own name as consignor, drawing for its price and taking credit for it in his own name in the bank.

[2] After loading, no demand was made by Menke for payment until more than a month after the car had been shipped, and in the interim appellant agreed to permit Bishop to owe him rather than to take a check on the bank or accept payment, and this was done to subserve his own purpose; that is, avoid payment on a land contract which he desired to evade. If there was a conditional sale, properly so called, that is, that the title is to pass, not upon delivery, but upon payment at some subsequent date, then in order to affect subsequent purchasers or creditors under article 5654, R. C. S., it should have been filed as a chattel mortgage. As above suggested, the contract upon which appellant sold the wheat required payment upon demand, and not upon delivery; that is, required a subsequent payment, and the evidence clearly shows appellant and Bishop acted upon the understanding that payment was not due until demand; that is, that payment was not made a condition precedent to pass title. Southern Pine Co. v. Savannah Trust Co., 141 Fed. 806, 73 C. C. A. 60.

[3] Again, if it ever was the contract that

it was to be cash upon delivery, it is shown beyond controversy that appellant waived payment upon delivery. The writing itself shows such waiver. The agreement to wait on Bishop, the agreement that he could ship and sell, the fact that appellant loaded for shipment and knew it was to be shipped, knew that Bishop had the bill of lading, saw the bill, and asked if he had returns, and did not request payment to him of the proceeds, all show a waiver. It is irresistible that he did not consider the wheat his, nor the proceeds of the sale, which in this case was some $300 more than the price to be paid him. All these conclusively establish the relation of debtor and creditor between Menke and Bishop, which appellant recognized. In this state, as we understand the rule:

"Possession having passed, and the buyer, by the act of the seller, having been invested with the indicia of ownership, the policy of our law requires the situation—the possession in one and the right of property in the other—should continue no longer than is necessary to enable the seller to recover the goods with which he has parted. The law gives the seller the right to reclaim his goods, but he must do so promptly; otherwise, he will be held to have waived his right, and can only thereafter look to the buyer for the price."

This rule, it seems to us, should be strictly enforced•in this case. To ingraft upon this transaction a conditional sale after the bank had in good faith given Bishop credit on his current account for the proceeds of the sale, and after he had checked it out, and that, too, when appellant could have protected himself if he had demanded payment at once, would be unjust, and such a rule would unsettle and make hazardous the handling by banks of such commercial transactions, which are essential to the speedy disposition of the products of the country. Victor Co. v. Texas Co., 101 Tex. 94, 104 S. W. 1040; Scharff v. Meyer, 133 Mo. 428, 34 S. W. 858, 54 Am. St. Rep. 672.

[4] But, should we hold that the facts are sufficient to have warranted a finding by a jury that there was in fact no sale, and only permission to take the grain into the dealer's possession, and to take a bill of lading in his name as consignor, and to sell and receive the proceeds and place to his credit in the bank, and even though the bank might have known such fact, yet we do not think a right to recover is shown in this case. Bishop, according to appellant's contention, would be but a bailee with authority and the apparent right to handle and deal with the wheat and the proceeds, which would protect the bank on Bishop's checks. Bank v. Claxton, 97 Tex. 569, 80 S. W. 604, 65 L. R. A. 820, 104 Am. St. Rep. 885.

A careful examination of the entire record and evidence has convinced us that no other judgment should have been rendered than that which the court did render, and we therefore affirm it.

---

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes