W. P. LUSE, Appellant,

v.

CRISPIN COMPANY et al., Appellees.

No. 13631.

Court of Civil Appeals of Texas.

Houston.

March 9, 1961.

Rehearing Denied April 6, 1961.

Vinson, Elkins, Weems & Searls, Tarlton Morrow, Houston, J. W. Hassell, Jr.; Prentice Wilson, Dallas, for appellant.

John H. Benckenstein, Beaumont, for appellee Union City Transfer.

Fulbright, Crooker, Freeman, Bates & Jaworski, L. Keith Simmer, St. John Gar-

wood, Jr., Houston, for appellee Crispin Co.

WERLEIN, Justice.

This suit was brought April 6, 1957 by Union City Transfer, sometimes referred to as Union herein, in the nature of an interpleader action with the Crispin Company, herein referred to as Crispin, and W. P. Luse, as defendants. Other defendants were Transcontinental Oil Company of Oklahoma, which filed a disclaimer, and C. P. Suce and C. P. Luce, admittedly nonexistent and later dismissed. Pleas of privilege filed by appellant Luse were overruled, and the judgment was affirmed in an opinion by the Court of Civil Appeals at Waco, Luse v. Union City Transfer et al, 324 S.W.2d 935, writ dismissed.

The interpleader had to do with some 18,843.37 feet of oil well casing that was in possession of Union as a claimed stakeholder at its warehouse in Beaumont, Texas. On March 11, 1958, the casing or pipe was, by agreement approved by the court, released to Luse at an agreed value of $35,704.07, which was substituted for the pipe.

The case was tried to a jury. At the close of the evidence the Trial Court overruled appellant's motion for a directed verdict against Crispin, and submitted the case to the jury upon 14 special issues, thirteen of which relate to the controversy between Crispin and Luse. After the verdict, appellant filed a motion for judgment against Crispin (a) notwithstanding the verdict, (b) upon the uncontroverted evidence and the verdict of the jury, and (c) upon the uncontroverted evidence and findings of the jury in response to Special Issues Nos. 3, 4, 5 and 9, and in disregard of the findings in response to Special Issues Nos. 1, 2, 7, 8, 10, 11, 12 and 13. Appellant's motions were overruled, and judgment rendered upon the verdict for Crispin against appellant in the sum of the agreed value of the released pipe.

Appellant Luse under his first six Points, briefed together, asserts in essence that the Trial Court erred in overruling his motion for a directed verdict and judgment against Crispin Company because under the undisputed evidence Crispin authorized Transcontinental Oil Company, herein referred to as Transcontinental, to sell the pipe to Luse and so acted with full knowledge of all the facts, including information that Transcontinental was buying the pipe to sell to Luse, as to estop itself from asserting its retention of title; and also because the loss against which Crispin had the means of protecting itself by avoiding the sale to Transcontinental, or otherwise, should fall upon Crispin which shipped the pipe to the warehouse in Beaumont as the essential step of delivery and transfer of title to Luse, thereby consenting thereto and estopping itself from questioning Luse's title. A determination of these contentions necessitates a careful examination of the record.

The evidence shows that Williams, vice president of Crispin, and the person who represented it in the transaction, having learned that Transcontinental was interested in purchasing some pipe, called Buffum, president of Transcontinental, in Oklahoma, with respect to selling it pipe. No sale was then completed, but at such time Buffum informed Williams that he would have to check with his customer as to the price and would call Williams. In the afternoon of the same day, February 21, 1957, Buffum called Williams and an oral sale of the pipe in question to Transcontinental was consummated at an agreed price of $2.31 per foot F.O.B. Houston. Williams testified that Buffum said, "We will make it a cash transaction. I will pay you immediately upon receipt of your invoice."

Williams testified that in his telephone conversation with Buffum, Buffum told him that he wanted to buy the pipe and sell it to Luse. Williams told Buffum that because of the small margin it would have

to be a cash transaction, and Buffum said, "Send me your invoice and I will send you a check right away." The invoice made by Williams, dated March 1, 1957, reads, "Terms: net cash receipt invoice".

Prior to sending such invoice dated March 1, 1957, Crispin shipped the pipe in question by Newsom Truck Line, Inc., on a series of open bills of lading, one for each truck, reading, "Consigned to Transcontinental Oil Company % C. P. Luce % Union City Transfer Company, destination Beaumont, Texas." Delivery was made to the Beaumont warehouse of Union on February 23, and February 25, 1957, for the account and credit of Luse, and the pipe was there racked, collared and tallied in the name of Luse. The evidence shows that due to error the name in the bills of lading was written "C. P. Luce" and in one instance "C. P. Suce" instead of W. P. Luse, known to be the proper party. On February 26, 1957 Luse paid Transcontinental's draft drawn on him which was accompanied by invoice in the discounted sum of $46,931.50, being the amount he agreed to pay Transcontinental for the pipe.

On March 1, 1957, four days after the completion of delivery of the pipe to the Beaumont warehouse where it had been tallied and credited to the account of W. P. Luse, and three days after Luse had paid the draft drawn on him, Crispin mailed its invoice for the pipe to Transcontinental, together with a uniform straight bill of lading of the same date, not signed by the consignee. On March 5, 1957, no remittance having been received, Williams, of Crispin, called Buffum who told him that "he was a little short and hadn't collected his money from W. P. Luse." He called again on March 11 and was again put off. On March 27 he received from Transcontinental a customer's draft dated March 25, 1957, payable to Crispin on April 1, 1957 in the sum of $43,236.87. Although duly deposited, payment was refused on the draft on

April 4, 1957, whereupon Crispin sent a telegram to Union's warehouse asserting its claim to the pipe in question and on the same day notified Luse of its claim, this being the first notice to Luse of such claim except for a telephone call the day before from one of Crispin's attorneys.

The written purchase order, executed by Luse to Transcontinental on December 5, 1956, and under which the pipe was shipped, expressly provided that, "You will please ship all of the above tubular goods to W. P. Luse c/o Union City Transfer Company, Beaumont, Texas." The invoice accompanying the sight draft drawn on Luse called for a sight draft with bill of lading to be attached, but no bill of lading was attached thereto or received by Luse prior to such payment. Bostick, Luse's office manager, first learned of delivery of the shipment on February 25, 1957, when a Dallas bank called him about Transcontinental's draft. Bostick requested and was given an extension of a day in which to pay the draft. After then making a long distance call to Union and learning that the pipe had been shipped on straight bills of lading, prepaid and no advance charges, and also after calling Buffum and being informed by him that he had bought the pipe on open account and it was being shipped on open or straight bills of lading, Bostick, on February 26, 1957, approved payment of the draft in the discounted amount of $46,931.50, being the amount owing Transcontinental after Buffum agreed to a discount of 50 cents per foot because of an overshipment of 6,000 feet of pipe. Bostick testified that at such time he didn't know Crispin Company existed and that Buffum didn't disclose where the pipe came from and he did not know or inquire; that he relied on Union and Buffum and acted in good faith, relying upon their statements that the pipe was consigned to Transcontinental for the account of Luse on a straight or open bill of lading.

Williams testified that he knew the difference between a straight or open bill of

lading and a bill of lading to shipper's order; that he didn't elect to use a shipper's order bill of lading; and that when he released the pipe for shipment to Beaumont for the account of Luse, he permitted the pipe to go down there on an open bill of lading. He knew that if Crispin used a shipper's order bill of lading, the pipe could not be released to Transcontinental, Luse or anyone else without Crispin's consent. While, according to his testimony he did not know that if Transcontinental sold the pipe to Luse, it might collect the purchase price before Crispin got their invoice to Oklahoma, he knew it was possible. He knew also that Luse lived in Dallas, but he didn't call him and advise him the pipe had not been paid for. In making the sale to Transcontinental, there was no discussion between Buffum and Williams relative to the passage of title.

It is uncontroverted, as shown by the Court's construction of the evidence and the agreement of the parties made in open court, which occurred after the Trial Court had overruled appellant's motion for a directed verdict, and while in the course of preparing its charge to the jury, (1) that Crispin knew that Transcontinental proposed to resell the pipe involved in this suit to W. P. Luse; (2) that Crispin knew the pipe was being shipped to Beaumont with Transcontinental as consignee for the purpose of delivery to Union for delivery to Luse should he buy the pipe from Transcontinental, and (3) that Crispin in agreeing to sell the pipe to Transcontinental contemplated that Transcontinental would sell the pipe to Luse and collect from Luse the agreed price which Luse was to pay.

In addition to this, the undisputed evidence shows that Crispin made an oral contract of sale to Transcontinental; that check was to be sent right away to Crispin by Transcontinental upon transmittal of invoice to it; that the pipe was shipped promptly to Union at Beaumont under an open and unrestricted bill of lading; that the consignee was Transcontinental and that the bill of lading shows upon its face that the shipment was for the account of appellant Luse; that Luse was advised upon inquiring of Union that the shipment had been received upon an open bill of lading without restriction or other charge and had been credited to his account; that after being so advised and after being similarly advised by Buffum and obtaining a postponement of one day from the bank, Luse paid the draft of Transcontinental on February 26; that the invoice and said bill of lading dated March 1, 1957 did not go forward to Transcontinental until that date; that no inquiry was made by Crispin until March 5, 1957 when Crispin was told by Transcontinental that it had not yet collected its money from Luse; and that Luse was not advised until 35 days after delivery and 30 days after the conversation of March 5 between Crispin and Buffum, that payment had not been made by Transcontinental and that Crispin was claiming the pipe.

The evidence further shows that Crispin knew at all times that Transcontinental had purchased the pipe for resale to Luse, but notwithstanding such fact, it elected to send the pipe on an open bill of lading and released the pipe to be shipped on such open bills of lading. It will be noted also that on March 5, when Crispin's agent, Williams, was told by Buffum that Luse's funds had not yet been collected, he expressed no surprise or concern and took no action whatever, but waited until March 11, 1957, when upon making further inquiry he was stalled again. He then waited until March 25 or 26, when he received and deposited Transcontinental's draft payable April 1, 1957.

Although Williams testified that the sale was a cash sale, the evidence clearly shows that the purchase price was not to be paid by Transcontinental upon delivery of the pipe at Beaumont, but was to be paid upon receipt of Crispin's invoice in Oklahoma. There was no agreement between the parties that payment should be

made before or concurrently with delivery of the pipe at Beaumont. There was no agreement that delivery of the pipe was to be delayed until the purchase price was paid. It was contemplated that delivery should precede the payment of the purchase price. Williams testified that he did not expect to receive payment from Transcontinental upon delivery of the pipe but at some date later on. He further testified that at the time of the sale he knew Luse to be reputable and financially responsible so that he had no concern about the matter of payment. It is to be noted also that the bill of lading dated March 1, 1957, which Williams said was merely evidence of delivery and not a bill of lading, showed that the delivery was not in any way restricted. Indeed, the evidence shows that the shipment was made to Union without any reservation of title or retained power of disposal by Crispin.

Appellant contends that the sale by Crispin to Transcontinental was not a cash sale but that it was contemplated that credit would be extended, at least until Transcontinental received Crispin's invoice. The general rule in Texas is that where the contract of sale of personal property calls for cash on delivery, concurrent payment upon delivery is essential to pass the title, and in the absence of an estoppel the vendor may retake the property in the hands of an innocent purchaser for value. Parma v. First Nat. Bank of Cameron, Tex.Com.App., 63 S.W.2d 692; Menke v. First Nat. Bank, 206 S.W. 693, writ ref.; Victor Safe & Lock Co. v. Texas State Trust Co. et al., 1907, 101 Tex. 94, 104 S.W. 1040. To the contrary see Durant Milling Co. v. Hall, Tex.Civ.App., 284 S.W.2d 760, writ ref., n. r. e., in which the check given in payment for the grain upon delivery of the grain was dishonored. Although the original seller acted promptly, the court held that under the weight of authorities generally good title passed to the bona fide purchaser of the vendee. See also Kempner · v. Vaughn, Tex.Civ. App., 174 S.W. 695.

In the instant case, however, the terms of the sale were not cash on delivery but cash at some later date, to wit: On receipt of invoice which presumably might be delayed for a number of days. A cash sale is one in which the contract calls for payment of the price in cash when the contract is made or the goods are delivered. 37–A Tex.Jur., p. 280, Sales § 124, and authorities cited.

In Menke v. First Nat. Bank, supra, the testimony was that the sale of the wheat in question was by oral contract and a cash transaction. The court, however, noted that the contract for the sale required payment upon demand, that is, a subsequent payment and not payment upon delivery. Hence, payment was not made a condition precedent to pass the title. The court held that if there was a conditional sale, that is, that the title was to pass upon payment at some future date, then in order to affect subsequent purchasers or creditors the contract under Article 5654, R.C.S., should have been filed as a chattel mortgage. See also Nicewarner v. Alston, Tex.Civ.App., 228 S.W. 2d 872, Ref., n. r. e.

We think the modern law with respect to cash sales is well stated in Williston on Sales, Rev. Ed., § 343, as follows:

"* * * Confusion may be caused by the use of the words 'cash sale' or 'terms cash' by business men. In business dealings these words are frequently used when in reality a short period of credit is contemplated. In such a case it is clear that there is no cash sale in the legal sense. Under the circumstances suggested, it is not contemplated that the buyer shall refrain in the meantime from dealing with the goods or even from reselling them, and if such is the contemplation of the parties, it is impossible to say that the property was not to pass until the price was paid. Clear as this is on principle, there are cases which disregard it."

In the present case the pipe was not only delivered to Union but the delivery was accompanied by open bills of lading which were sent directly to the warehouse and to Transcontinental. Under these circumstances, had the goods been lost through fault of the carrier, we think the loss would have fallen on the vendee. Nashville, C. & St. L. Ry. Co. v. Grayson County Nat. Bank, 1906, 100 Tex. 17, 93 S.W. 431; Harry Wagner Products Co. v. Adams, Tex.Civ.App., 258 S.W.2d 190, writ ref., n. r. e.; Alexander v. Heidenheimer, Tex.Com.App., 221 S.W. 942.

But regardless of this, it is our view that the parties in the instant case contemplated that the sale was to be completed when the pipe was delivered, and that title would pass to Luse upon his purchase of the pipe from Transcontinental. If Crispin had any intention to the contrary, such intention was not disclosed to Transcontinental or Luse. Crispin knew that the pipe was being shipped to Beaumont for the purpose of effectuating the sale of the same by Transcontinental to Luse, and that payment would be made by Luse direct to Transcontinental. Williams's attitude when informed on March 5 that Transcontinental did not yet have Luse's money, seems to corroborate the intention of the parties that the sale would be made by Transcontinental to Luse prior to the payment of Transcontinental to Crispin. But whether this is true or not, it is certain that Crispin when it shipped the pipe to Beaumont did so for the purpose of enabling Transcontinental to sell the pipe to Luse. If this were not so, there could be no reason for Williams, who knew the difference between an open bill of lading and a shipper's order bill, releasing the pipe as he did.

We do not hold that Crispin could not have recovered the pipe from Transcontinental if it had promptly elected to do so, prior to the purchase by Luse. What we do hold is that under the undisputed facts of this case, Luse acquired title to the pipe. The instant case is distinguishable from the Victor Safe & Lock Co. case, supra. The sale in that case was for cash on delivery and not upon receipt of invoice. Then, too, the safe was shipped to the Trust Company for its use and there was no understanding or agreement that it would sell the same to anyone else. In the present case, it was not only contemplated that Transcontinental would sell the pipe to Luse at Beaumont, but the pipe was sent there for the express purpose to effectuate such sale. See Mechem on Sales, Sec. 601. It is not a case of mere delivery of the pipe but delivery of the pipe coupled with the indicia of title commonly relied upon by business men in their dealings, coupled with Crispin's knowledge that the pipe was being sold to Luse. Luse did not know Crispin in the deal, but before paying Transcontinental's sight draft, which he was required to pay, he ascertained that the pipe had been shipped under open bills of lading, and had been collared, racked, tallied and credited to him in his name.

In Gillette v. Houston Nat. Bank, Tex. Civ.App., 139 S.W.2d 646, 649, writ dism., judg. correct, the Court stated:

"'It must be conceded, that as a general rule, applicable to property other than negotiable securities, the vendor or pledgor can convey no greater right or title than he has. But this is a truism, predictable of a simple transfer from one party to another where no other element intervenes. It does not interfere with the well-established principle, that where the true owner holds out another, or allows him to appear, as the owner of, or as having full power of disposition over the property, and innocent third parties are thus led into dealing with such apparent owner, they will be protected.'"

See also 46 Amer.Jur., § 461, p. 629, to like effect.

Even if Crispin had the right to avoid the sale insofar as Transcontinental is concerned, a matter upon which we need not pass, it did not have such right after Luse in good faith had bought the pipe from Transcontinental and paid for it in full. If Crispin did not give to Transcontinental through the open bills of lading, through delivery to the carrier, and through delivery to the storage yard for Luse's account, title to the property, it passed to Transcontinental the unquestionable indicia of title and apparent ownership, so that in any event Luse obtained title by virtue of an estoppel.

Moreover, the law is well settled that Luse and Crispin, being equally entitled to consideration, if one of the parties must suffer loss for the failure of Transcontinental to pay Crispin for the pipe, the loss should fall upon Crispin which had full knowledge of the transaction and the means of protecting itself by the simple expedient of transporting the pipe under a shipper's order bill of lading or stipulating on the bill that delivery was to be made only upon condition of prior or concurrent payment of the purchase price. In Sackenreuther v. Winston, Tex.Civ.App., 137 S.W.2d 93, 97, writ ref., the Court said:

> "Our courts have uniformly held that where one or two persons, equally entitled to consideration, as far as their purposes are concerned, must suffer from the delinquency of a third, the loss more properly falls upon him, who, having readily at hand the means of protection, has failed to avail himself of them."

To like effect see Gillette v. Houston Nat. Bank, supra; Monroe v. Wharton Bank & Trust Co., Tex.Civ.App., 155 S.W.2d 632, ref., w. o. m.; Parma v. First Nat. Bank of Cameron, supra; 37–A Tex. Jur., § 250, p. 523 et seq.

In R. Piel Gin Co. v. Independent Farmers' Gin Co., Tex.Civ.App., 257 S.W. 630, 632, the court stated:

"The issue tendered by appellant is one of estoppel. * * * An innocent purchaser is protected because he has expended his money in good faith to the amount of the purchase price of the property, relying upon an apparent situation reasonably calculated to mislead him, which the real owner has created, or at least has permitted to continue to exist. On that account it is inequitable to require such purchaser, rather than the real owner, to suffer the attending loss."

See also Victoria Bank & Trust Co. v. Monteith, Tex.Com.App., 138 Tex. 216, 158 S.W.2d 63.

We think the character of the shipment in this case, Crispin's admitted knowledge of the contemplated resale to Luse at the time of shipment, its election to ship upon an open unrestricted bill of lading, instead of shipper's order, its authorization, either express or implied, of the resale of the pipe to Luse, its admitted knowledge that Transcontinental would not be obligated to pay until after completion of the shipment, bring the undisputed facts of this case within the rule announced in Parma v. First Nat. Bank of Cameron, Tex.Com. App., 63 S.W.2d 692, 694, where, quoting in part the opinion of the Court of Civil Appeals, 37 S.W.2d 274, Judge Short, speaking for the Commission, said:

> " 'Parma knew at the time said company was only a local buyer; that it also contemplated shipping out cotton so handled; that this cotton would, in the usual course of business, probably be resold and shipped out of Cameron within a few days, and that such was the only purpose for which the Vest Cotton Company purchased it * * *.' In other words, we think that the Court of Civil Appeals correctly held that when Parma delivered the compress receipts to the Vest Cotton Company, * * * it was intended as a delivery of the possession of the cotton itself. In so doing he in-

vested the purchaser with the full power to dispose of it and make delivery to a subsequent purchaser. The plaintiff in error, having voluntarily made unconditional delivery of the cotton to the Vest Cotton Company by delivering the warehouse receipts therefor, must be held to the logical and legitimate consequences of his acts in so doing so far as third parties are concerned, who were innocent of any wrongdoing."

In the Parma case the warehouse receipts were the symbols representative of the property, whereas in the present case there was actual physical delivery of the pipe upon an open bill of lading delivered to Transcontinental for the account of Luse. The general rule is that delivery to a carrier or other agent of the buyer as directed by him constitutes a delivery to the buyer and title passes, subject to his right to rescind if the property is not of the quality and kind that he is entitled to receive under the contract. 37–A Tex. Jur., § 189, p. 394; Harry Wagner Products Co. v. Adams, supra; Alexander v. Heidenheimer, supra.

Under the undisputed evidence in this case we think the court should have granted appellant's motion for an instructed verdict. The court, however, submitted the case on special issues. In answer to Special Issues Nos. 3, 4, 5 and 9, the jury found as follows:

3. That Bostick, appellant's office manager, through whom the transactions were handled, was not in possession of facts or information which would have put an ordinarily prudent person upon inquiry, which, if diligently pursued, would have led to the discovery before payment of Transcontinental's draft that Crispin had not been paid for its pipe.

4. That Transcontinental was not authorized by Luse, in Luse's behalf, to contract with Crispin for purchase of the pipe.

5. That at the time of making the contract for the purchase of the pipe Transcontinental did intend to pay for it.

9. That Luse in good faith purchased from and paid Transcontinental a valuable consideration for the pipe without notice of any claim by Crispin.

These findings of the jury, which are amply supported by the evidence, clearly show that Luse was a bona fide purchaser of the pipe and was not in possession of any facts or information which would put him upon inquiry of any claim by Crispin.

The jury found in answer to Special Issues Nos. 1 and 7 that Crispin and Transcontinental had agreed upon a cash sale of the pipe, as defined by the court, and that Crispin did not make a credit sale as defined by the court. We think the undisputed evidence shows that the sale was not a cash sale but was a credit sale, and that the jury's findings to the contrary should be set aside and disregarded. If we are mistaken in this, under the undisputed facts and evidence in this case, and the applicable law, title nevertheless passed to Luse by estoppel.

The jury's finding to Special Issue No. 2 to the effect that by delivering the pipe on a straight bill of lading, Crispin did not intend to waive the requirement of payment, is of no legal significance. Whether it secretly intended to claim the pipe and did not intentionally and voluntarily waive its right to do so, is not a controlling issue and must be disregarded under the uncontroverted facts of this case. We think the same thing is true with respect to the jury's finding to Special Issue No. 8 that Crispin did not by its acts and conduct waive any claim to the title to the pipe as against Luse. As a matter of law Luse is protected by the method in which Crispin elected to effect the sale and his good faith reliance upon the situation created or permitted by Crispin.

The answer of the jury to Special Issue No. 10, that at the time Luse paid for the pipe he was not without notice that Crispin Company was asserting that if Transcontinental did not pay for the pipe Luse would get no title, finds no support in the evidence and is against the uncontradicted evidence in the case and contrary to the findings of the jury in response to Special Issues Nos. 3 and 9. We think the same thing is true with reference to the answer of the jury to Special Issue No. 11. The undisputed evidence shows that the acts and conduct of Crispin in sending the pipe to Beaumont on an open bill of lading for the purpose of effecting a sale by Transcontinental to Luse of such pipe, resulted in Luse paying Transcontinental for the pipe which had been credited to his account in Union's warehouse. There is no evidence that anything other than the acts and conduct of Crispin as reported to him by Union and also Buffum, led Luse in good faith to believe that Transcontinental was not only in possession of the pipe, but had possession thereof with the right to sell the same. Luse fulfilled his obligation to Transcontinental relying on the situation created by Crispin and in the absence of any notice from Crispin that it had not been paid. The jury's finding to Special Issue No. 12, that Crispin's failure to give notice was not negligence on its part, is of no legal significance under the undisputed facts of this case. The jury's answer to Special Issue No. 13 is likewise of no controlling significance. Crispin knew that the pipe was shipped to Transcontinental in order to sell the same to Luse. It was necessarily put upon notice that the sale might take place before receipt of the invoice from Crispin to Transcontinental.

We are of the opinion that the trial court erred in overruling appellant's motion for an instructed verdict and also his motion for judgment against Crispin notwithstanding the verdict of the jury, or upon the uncontroverted evidence and findings of the jury in response to Special Issues Nos. 3, 4, 5 and 9, and in disregard of the findings in response to Special Issues Nos. 1, 2, 7, 8, 10, 11, 12 and 13.

We have examined the cases cited by appellee and find that they are factually distinguishable and inapplicable to the peculiar fact situation in the instant case. In view of our holding, it is not necessary to discuss appellant's other Points of Error.

In a separate brief, however, appellant asserts that the court erred in failing to submit to the jury his Special Issue reading:

"Do you find from a preponderance of the evidence that the Interpleader action herein filed was filed in good faith by Union City Transfer Company?"

Appellant also contends that the court erred in submitting Special Issue No. 14 inquiring as to the reasonable costs incurred by Union in the preparation, filing and prosecution of this suit, including a reasonable attorney's fee. He also asserts that the court erred in its instructions as to what should be considered in determining what is a reasonable attorney's fee to be allowed Union's attorney, and contends that the fee allowed is excessive.

The jury found that the reasonable costs incurred by Union in the preparation, filing and prosecution of this suit, was $3,000, and the court decreed that Union recover such amount as attorney's fees to be taxed as a part of the costs of court herein. We have considered appellant's contentions as well as the brief filed by Union's attorney, and have concluded that the action was properly brought as an interpleader action under Article 5628, Ver-

non's Ann.Tex.Civ.St., and Rule 43 Texas Rules of Civil Procedure, and that the court did not err in ruling as a matter of law that the interpleader action was filed in good faith. Indeed, we think the evidence conclusively establishes such fact, and that there was no error in connection with the court's refusal to give the Issues requested by appellant. See Luse v. Union City Transfer, Tex.Civ.App., 324 S.W.2d 935, for additional facts bearing upon Union's good faith.

John H. Benckenstein, attorney for Union, testified in substance that Union had incurred expenses for travel, service of citations, printing of briefs, telephone and telegraph expense, up to the date of trial on the merits of the case in the sum of $444.47. The trial lasted five days and during such time Union had to pay its attorney's expenses of hotel and meals, etc. He testified as to the time consumed in connection with the case and that based upon his knowledge and experience in the practice of his profession a reasonable attorney's fee for the services which had been performed from the date he was consulted up to the date trial began was $2,500. No evidence to the contrary was introduced.

Union's attorney concedes that had there been no question raised as to the propriety of filing the bill of interpleader, an attorney's fee of from $250 to $500 would be reasonable. He asserts that since the filing of the interpleader action, he had endeavored to keep the expenses and attorney's fees down, but Luse's attorneys had not seen fit for him to do so, as they took and maintained the position that the suit filed by Union was not properly an interpleader.

Appellant has insisted from the time the interpleader was filed down to the present time that the action of interpleader was not brought in good faith. He has thus made it necessary for Union's attorney to show not only that the interpleader was prosecuted in good faith but also to be present at, if not to actually participate in, all the various steps taken by the parties in this suit, in order to safeguard Union's interest and protect it against any possible liability. We think the threat to Union continued even after the agreement between Luse and Crispin substituted cash for the pipe. The stipulation did not release possible claims against Union. At the hearing on the pleas of privilege and the appeal from the trial court's ruling thereon, appellant continued to assert that Union's suit was not a valid interpleader. He has so asserted on this appeal, thereby in effect forcing Union to file a brief herein of more than forty pages. We shall not enumerate the services rendered by Union's attorney. Suffice it to say that we have read the statement of facts and have carefully examined the entire record, and we cannot say that the amount allowed is excessive or that it covers any improper items.

The judgment of the trial court insofar as it awards Union City Transfer $3,000 to be taxed as court costs will remain undisturbed. Since appellant's legally unjustifiable and persistent contest of the propriety of the interpleader has resulted in Union's recovery of a much larger amount than it would probably have otherwise recovered, $1,500 of such amount is taxed against appellant.

The judgment in favor of the Crispin Company against W. P. Luse is reversed and rendered.