UNPUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

WAVE MAKER SHIPPING COMPANY,
LTD,

*Plaintiff-Appellee,*

and

ESTONIAN MARITIME AGENCY, LTD,
*Intervenor-Plaintiff-*
*Appellee,*

and

MORAN TOWING, INCORPORATED;
ALAMCO, A.G.; ALIMAR
CORPORATION; MARAMET AND GAMLA
BROG.; POSEIDON & FRACHTCONTOR
JUNGE LTD,

*Intervenors-Plaintiffs,*

v.

HAWKSPERE SHIPPING COMPANY,
LIMITED,

*Defendant,*

and

CLIPPER BULK SHIPPING, LTD,
*Garnishee-Appellant.*

No. 02-1016

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Williams M. Nickerson, Senior District Judge.
(CA-00-3408-WMN)

Argued: October 31, 2002

Decided: January 23, 2003

Before NIEMEYER, WILLIAMS, and MICHAEL, Circuit Judges.

---

Vacated in part by unpublished per curiam opinion.

---

**COUNSEL**

**ARGUED:** Geoffrey S. Tobias, OBER, KALER, GRIMES & SHRIVER, P.C., Baltimore, Maryland, for Appellant. John Henry West, III, WEST & MOORE, L.L.C., Baltimore, Maryland, for Appellees. **ON BRIEF:** David W. Skeen, WRIGHT, CONSTABLE & SKEEN, L.L.P., Baltimore, Maryland, for Appellee Estonian.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

**OPINION**

PER CURIAM:

This appeal of a maritime order of attachment involves a question of ownership, specifically the ownership of bunker fuel aboard the M/V NOBILITY. Clipper Bulk Shipping, Ltd. appeals the denial of its motion to vacate a district court order attaching fuel ("bunkers") worth $57,163.90 on board the M/V NOBILITY, a ship subchartered by Clipper to Hawkspere Shipping Company, Ltd. During the period of Hawkspere's subcharter, the appellees, who are creditors of Hawkspere, attached the NOBILITY's bunkers. Because we conclude that the bulk of the bunker fuel aboard the NOBILITY was not the property of Hawkspere at the time of attachment, we vacate the attachment in part and reduce Clipper's bond liability by $49,225.90.

I.

The facts in this case are largely undisputed but require rather detailed recitation. We begin by explaining the relationship between

the appellant, Clipper Bulk Shipping, Ltd. ("Clipper"), and Hawkspere Shipping Company, Ltd. ("Hawkspere"), the company against whom attachment was sought. On October 10, 2000, Clipper sub-chartered the M/V NOBILITY to Hawkspere for one voyage from the Baltic Sea to the Eastern United States. J.A. 110-29. Hawkspere is not a party to this case and appears to now be defunct. The charter party (or contract) between Clipper and Hawkspere provided that Hawkspere on delivery, and Clipper on redelivery, would take over and pay for all bunkers on board the vessel. J.A. 117. When Hawkspere took delivery of the NOBILITY, it duly paid for the bunkers then aboard. J.A. 130-32. On October 24, 2000, while the NOBILITY was in St. Petersburg, Russia, Hawkspere purchased an additional 400 tons of bunker fuel from Baltic Bunkering Co. ("Baltic"). J.A. 142-43. Baltic supplied and sold the bunkers to Hawkspere under terms provided in a Standard Marine Fuel Purchasing Contract ("FUELCON"). J.A. 148-50. Clause 11 of the FUELCON provided that "[t]itle to the Marine Fuels shall pass to the Buyers upon payment for the value of the Marine Fuels delivered . . . . Until such payment has been made, the Sellers shall have a right of lien over the Marine Fuels delivered." J.A. 150. Hawkspere never paid Baltic for the bunkers. On appeal the appellees suggest that Hawkspere was not aware that the FUELCON governed the terms of the sale until after the attachment. The appellees do not offer any evidence, however, as to what terms would have governed the sale if not the FUELCON's. The district court assumed that the FUELCON applied, *see* J.A. 275, as do we. English law governs both the charter party and the FUELCON. J.A. 116, 150.

When the NOBILITY docked in Baltimore Harbor in November 2000, nearly all of the original bunker on board had been consumed. It is uncontested that of the $57,163.90 worth of fuel then aboard the NOBILITY, all but $7,938.00 (which represents the fuel remaining from what was on board when Hawkspere took delivery of the NOBILITY from Clipper) was from the Russian bunkers. J.A. 274. On November 16, 2000, Wave Maker Shipping Company, Ltd. ("Wave Maker"), a creditor of Hawkspere, filed suit in the District of Maryland to attach Hawkspere property, specifically the bunkers on the NOBILITY, in order to satisfy an arbitration award Wave Maker received against Hawkspere in an unrelated matter. J.A. 264-65. The bunkers were attached pursuant to a district court order issued on November 16, 2000. J.A. 265. On November 21, 2000, Clipper

moved to dissolve the attachment, arguing that Hawkspere had sold the attached bunkers to Clipper pursuant to a mid-charter "sale," and thus Clipper, not Hawkspere, owned the bunkers at the time of attachment. The district court denied the motion. J.A. 265-66. Shortly thereafter, Estonian Maritime Agency, Inc. ("Estonian") and Poseidon & Frachtcontor Junge, Ltd. ("Poseidon") intervened in the attachment suit seeking damages for unpaid services provided to Hawkspere. Poseidon has withdrawn from this appeal. The remaining appellees, Wave Maker and Estonian, are referred to collectively as Wave Maker.

On November 30, 2000, Clipper posted a general bond to release the NOBILITY and her bunkers. J.A. 266. The bond promised to pay any final judgment that might be rendered in favor of Wave Maker against Hawkspere, in amounts not to exceed $57,163.90. *Id.* Clipper then took possession of the vessel and her bunkers, which have since been consumed. On May 16, 2001, Clipper moved to vacate the attachment of the bunkers by seeking to vacate the bond or, in the alternative, to reduce its amount. Clipper presented two arguments. First, Clipper again argued the mid-charter "sale" theory. The district court again rejected this argument, and Clipper does not pursue it on appeal. J.A. 268-73. Clipper's second, and only current, argument was that Baltic, not Hawkspere, owned the bunkers at the time of the attachment because Hawkspere never paid for the bunkers and thus Baltic retained ownership under the terms of the FUELCON. If Baltic owned the bunkers at the time of attachment, Clipper argued, Hawkspere's creditors could not attach them. The district court disagreed and denied Clipper's motion to vacate the attachment order. J.A. 273-77. Clipper now appeals.

## II.

The essential facts of this case are not in dispute. We review the district court's conclusions of law de novo. *S. C. State Ports Auth. v. M/V Tyson Lykes*, 67 F.3d 59, 61 (4th Cir. 1995). Supplemental Rule B of the Federal Rules of Civil Procedure authorizes the attachment of property in certain maritime actions. When the validity of an attachment is challenged, the burden is on the plaintiff to show why the attachment should not be vacated. *See* Fed. R. Civ. P. Supp. R. E(4)(f). Thus, Wave Maker bears the burden of proving that the bun-

kers in question were the property of Hawkspere at the time of attachment. *Swift & Co. Packers v. Compania Colombiana Del Caribe, S.A.*, 339 U.S. 684, 693 (1950). In its decision below, the district court concluded that the bunkers purchased from Baltic were Hawkspere property and thus properly subject to attachment. In reaching its decision, the district court relied heavily on precedent from the United Kingdom's House of Lords, *The Span Terza*, [1984] 1 Lloyd's Rep. 119 (1983), for the proposition that charterers hold all rights to bunkers during the term of the charter. We conclude, however, that the district court's reliance on *The Span Terza* is misplaced. Rather, for the reasons that follow, we conclude that under English law the bunkers belonged to Baltic, not Hawkspere, at the time of attachment and thus were not properly subject to attachment by the district court.

A.

Wave Maker argues on appeal, and the district court below concluded, that *The Span Terza* applies to this case. *The Span Terza* involved a dispute between a shipowner and a charterer over ownership of bunkers aboard a vessel. The charter party contained a clause almost identical to that in the charter party between Clipper and Hawkspere, under which the owners at the port of redelivery were to take over and pay for all fuel remaining on board the vessel. In *The Span Terza* the charter was rightfully cancelled by the charterer after the vessel was unavailable for hire for twenty-five days. *The Span Terza*, 1 Lloyd's Rep. at 120. The House of Lords concluded that "[u]nder the terms of the charter-party, the bunkers while aboard Span Terza were at all material times the property of the charterers." *Id.* at 122-23. The district court used this language to conclude that the bunkers aboard the NOBILITY "were at all times the property of" Hawkspere. But such a conclusion does not follow in this case. Unlike the situation in the case before us, in *The Span Terza* the charterer clearly had paid for the bunkers on board the vessel. *Id.* at 120. The court's task there simply was to determine the effect of the cancellation of the charter party on the ownership of the bunkers.

Here, however, we do not confront a dispute of ownership between a shipowner and charterer but rather between a charterer and a fuel supplier. That is, in the case before us, Clipper claims that Hawkspere never gained title to the bunkers because Hawkspere never paid Baltic

for them. Under the FUELCON Baltic retained title to the bunkers pending full payment by Hawkspere. The district court, however, did not address the "retention of title" provision in the FUELCON, despite the court's acknowledgment that Hawkspere never paid Baltic for the bunkers. Instead, the district court found as follows:

> In the present case, as of the time of attachment, Hawkspere had purchased the Russian bunkers . . . ; Hawkspere had not yet redelivered the ship to Clipper Bulk and was still operating under the charter; and the due date for payment on the Russian bunkers had not yet arrived. Under the principles of the *SPAN TERZA* case and according to the terms of the charter, the Court finds that the Russian bunkers were property of Hawkspere when attached.

*Wave Maker Shipping Co., Ltd. v. Hawkspere Shipping Co., Ltd.*, Civil Action WMN-00-3408, Mem. at 14 (D.Md. Dec. 3, 2001). Thus, the district concluded that the relationship between the charterer and shipowner controls this case. The critical question, however, is the relationship between Baltic and Hawkspere, namely, whether Hawkspere ever acquired title to the bunkers.

*Forsythe Int'l (UK) Ltd. v. Silver*, [1993] 2 Lloyd's Rep. 268, an English admiralty case, decided after *The Span Terza*, explains the effect, under English law, of the retention of title provision on ownership of the bunker as among the fuel supplier, charterer, and shipowner. In *Forsythe* a British admiralty court found that where a charterer acquired bunkers from a fuel supplier under a contract that contained a retention of title provision, the supplier, not the charterer or shipowner, retained title to the bunkers pending payment. *Id.* at 272. In *Forsythe* a bunker oil trader sued both the charterer and owner of a vessel. The trader's contract with the charterer contained a retention of title provision that provided that "Marine Fuels shall remain the sole and absolute property of the Seller as legal and equitable Owner until such time as the Buyer shall have paid to the Seller the agreed price." *Id.* at 270. In *Forsythe* after the owners withdrew the vessel under the charter-party, the fuel traders, who had not yet been paid for the bunkers by the charterers, arrested the vessel. The fuel traders sought to recover the price of the fuel from the charterers based on contract and from the owners based on a theory of conver-

sion (that the owners misappropriated the fuel when they took redelivery of the vessel after cancellation of the charter party). The admiralty court found for the plaintiff fuel trader on both claims, determining that the plaintiff retained title to the bunkers regardless of who had possession of them (the charterer or owner). *Id.* at 280.

While the retention of title provision in *Forsythe* is more detailed and explicit than that in the instant case, the admiralty court in *Forsythe* did not rest its decision on the specific language of the contract. Rather, the court acknowledged the common understanding regarding the effect of the retention of title provision as between the fuel supplier and the charterer: "[P]roperty in the bunkers did not pass until they were paid for and . . . since the bunkers were not paid for, the property in them never passed to the charterers." *Id.* at 272. Thus, under the reasoning of *Forsythe*, property in the NOBILITY bunkers purchased in Russia clearly remained with Baltic pending payment by Hawkspere, and thus Baltic, not Hawkspere, owned the bunkers at the time of attachment because payment had not yet been made.

Such a result comports with the British Sale of Goods Act. The Sale of Goods Act specifically provides that parties may negotiate for retention of title provisions in sales contracts. Sale of Goods Act, 1979, c. 54, Pt III, §§ 17-20 (U.K.); *see also, e.g.*, *Armour v. Thyssen Edelstahlwerke A.G.*, [1991] 1 Lloyd's Rep. 95 (1990). While the Sale of Goods Act also provides protection for third parties who acquire goods without notice of another's lien or right in the goods, this protection does not extend to Wave Maker's attachment of the bunkers. Even assuming that Wave Maker had no notice of Baltic's right in the bunkers and that Wave Maker acted in good faith in attaching the bunkers, the Act does not protect Wave Maker because Hawkspere did not "deliver" the bunkers to Wave Maker within the meaning of the statute. *See* Sale of Goods Act, 1979, c. 54, Pt III, § 25 (U.K.). "Delivery" means a voluntary transfer of possession from one person to another, which attachment is not. *Cf. Forsythe*, 2 Lloyd's Rep. at 278-79 (concluding that where owners cancelled the charterparty, it would be "an abuse of language to say" that the charterers "voluntar[ily] deliver[ed]" the bunkers to the owners so as to give the owners title to the bunkers). Here, where Wave Maker attached the NOBILITY's bunkers through judicial action, it cannot be said that Hawkspere voluntarily transferred possession of the bunkers to its

creditors. Accordingly, Wave Maker is not entitled to third-party protection under the Sale of Goods Act.

## B.

Wave Maker points out that Baltic never acted on its rights and failed to make a claim of ownership in the attached bunkers. But that does not bear on the actual question of ownership; the relevant time is the time of attachment. At that point Hawkspere had not paid Baltic for the bunkers, and Baltic retained title to the bunkers under the FUELCON. Thus, the fact that Baltic did not object to attachment is legally irrelevant, and the fact that Baltic has not acted since does not bear on whether attachment was proper in the first place.

Wave Maker also appears to argue that to return the bond to Clipper somehow unjustly enriches Clipper. That is, Wave Maker claims that by dissolving the bond, Clipper will have received the benefit of the bunkers, which it has consumed, without paying for them. Under the circumstances, Wave Maker's argument is unpersuasive. After the arrest of the vessel and attachment of the bunkers aboard the NOBILITY, Clipper had no choice but to post a bond in order to release its vessel so that it could discharge the cargo remaining on board in connection with Hawkspere's time charter, thereby freeing the NOBILITY for future charters. At that time Hawkspere was in default on its payments to Clipper, forcing Clipper to bear all costs associated with the return of the NOBILITY. Clipper thus gains no unfair windfall by recouping that part of the posted bond that represents the value of the Russian bunkers. To the extent that Clipper's consumption of the Russian bunkers may have amounted to conversion of Baltic's property, Baltic remains free to assert its rights against Clipper. *See Forsythe*, 2 Lloyd's Rep. at 280.

In sum, we conclude that under English law the bunkers remained the property of Baltic, not Hawkspere, at the time of attachment and thus were not properly subject to attachment by the district court. We therefore vacate the attachment in part and reduce Clipper's bond liability by $49,225.90, an amount equal to the value of the Russian bunkers.

*VACATED IN PART*