### IN THE UNITED STATES COURT OF APPEALS
### FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

March 23, 2016

Lyle W. Cayce
Clerk

No. 15-40463

MALIN INTERNATIONAL SHIP REPAIR & DRYDOCK, INCORPORATED,

     Plaintiff - Appellee

v.

OCEANOGRAFIA, S.A. DE C.V.,

     Defendant - Appellant

Appeal from the United States District Court
for the Southern District of Texas

Before JONES, WIENER, and HIGGINSON, Circuit Judges.

WIENER, Circuit Judge:

Defendant-Appellant Oceanografia, S.A. ("OSA") appeals (1) the district court's denial of its motion to vacate attachment under Supplemental Admiralty Rule B and (2) that court's grant of Plaintiff-Appellant Malin International Ship Repair & Drydock, Inc.'s ("Malin") motion for summary judgment. Concluding that both the attachment and the summary judgment were proper, we affirm.

No. 15-40463

## I.

## FACTS AND PROCEEDINGS

Malin operates a shipyard in Galveston, Texas. In 2008 and 2009, Malin performed work for OSA, a Mexican corporation, and Con-Dive, LLC ("Con-Dive"), a now-defunct Texas company. Not having received payment for its work, Malin sued OSA for the balance of its unpaid invoices for work, services, materials, and supplies that it had provided to OSA at the request of Con-Dive. Malin sought recovery on the alternative theories of breach of contract and quantum meruit.

OSA operated a vessel, the M/V KESTREL, under a bareboat charter agreement. The registered owner of the M/V KESTREL, Cal Dive Offshore Contractors, Inc. ("Cal Dive"), had entered into a charter agreement with Gulf Offshore Construction, Inc. ("GOC"), which in turn bareboat chartered the vessel to OSA. OSA had taken delivery of the vessel on October 15, 2012. The charter agreement stated that "[a]t the time of delivery[, OSA] shall purchase the bunkers . . . in the said Vessel at the then current market price at the port of delivery." To obtain jurisdiction over OSA pursuant to Supplemental Admiralty Rule B, Malin attached the fuel bunkers[1] aboard the M/V KESTREL on October 29, 2012.

OSA and Cal Dive sought to vacate the attachment, contending that OSA did not hold an attachable interest in the bunkers at the time of Malin's attachment because title to them had not yet passed to OSA. According to OSA

---

[1] "Fuel bunkers" is the admiralty term for the fuel used by a vessel. *See Glossary of Marine Insurance and Shipping Terms*, 14 U.S.F. MAR. L. J. 305, 325 (2001–2002) (defining "bunkers" as "[f]uel to be used by the vessel's engines for power during the voyage; but not fuel loaded on board the vessel as cargo").

2

and Cal Dive, OSA had neither paid for the bunkers nor received an invoice for them and therefore did not own them.

The district court denied their motions, holding that OSA's possessory interest in the bunkers constituted an attachable interest under Rule B. Cal Dive then posted a vessel release bond to substitute for the seized bunkers of the M/V KESTREL and to secure the liability of OSA to Malin.

Malin then sought summary judgment on its breach of contract and quantum meruit claims against OSA. Malin contended that Con-Dive was OSA's agent and had authority to bind OSA to the invoices, or, in the alternative, that OSA had ratified the invoices or is liable to Malin on its claim of quantum meruit. In support, Malin supplied invoices detailing the amounts owed as well as e-mails from OSA indicating that it had received the invoices and agreed to pay them. The invoices also contained provisions for interest and attorneys fees. OSA opposed the motion. It filed only one item of summary judgment evidence: a declaration from an OSA employee stating that Con-Dive did not act as OSA's agent.

The magistrate judge recommended granting summary judgment in favor of Malin based on its ratification and quantum meruit theories. The magistrate judge also recommended that Malin be awarded attorneys fees on its ratification claim. The district court accepted and adopted the magistrate judge's Report and Recommendation, then rendered judgment to Malin for the amount of the invoices, plus accrued interest and attorneys fees. This appeal followed.

On appeal, OSA contends that the district court erred in denying its motion to vacate the attachment. It argues that the attachment of the bunkers was improper under Supplemental Rule B because the bunkers were not its

No. 15-40463

property. OSA further asserts that the district court erred in granting Malin's motion for summary judgment on its ratification theory.[2]

## II.

## ANALYSIS

### A. Attachment

The propriety of the attachment of the bunkers aboard the M/V KESTREL goes to the district court's jurisdiction over OSA, so we begin there. We review an order denying a motion to vacate an attachment under Rule B for abuse of discretion, and we review issues of law de novo.[3]

Supplemental Rule B provides:

> If a defendant is not found within the district when a verified complaint praying for attachment and the affidavit required by Rule B(1)(b) are filed, a verified complaint may contain a prayer for process to attach the defendant's tangible or intangible personal property—up to the amount sued for—in the hands of garnishees named in the process.[4]

"Rule B allows a district court to take jurisdiction over a defendant in an admiralty or maritime action by attaching property of the defendant."[5] The rule has two purposes: "to secure a respondent's appearance and to assure satisfaction in case the suit is successful."[6]

---

[2] OSA's attempt, in its Summary of the Argument, to challenge the district court's award of damages is waived by OSA's failure to brief it adequately. *See United States v. Sealed Appellant 1*, 591 F.3d 812, 823 (5th Cir. 2009).

[3] *Geneve Butane, Inc. v. Nat'l Oil Corp.*, 551 F. App'x 185, 185 (5th Cir. 2014) (unpublished); *see also Shipping Corp. of India Ltd. v. Jaldhi Overseas Pte Ltd.*, 585 F.3d 58, 66 (2d Cir. 2009).

[4] Fed. R. Civ. P. Supp. R. B(1)(a).

[5] *Submersible Sys., Inc. v. Perforadora Cent., S.A. de C.V.*, 249 F.3d 413, 421 (5th Cir. 2001).

[6] *Swift & Co. Packers v. Compania Colombiana Del Caribe, S.A.*, 339 U.S. 684, 693 (1950).

No. 15-40463

The only issue before us is whether the fuel bunkers constituted OSA's "tangible or intangible personal property" at the time of attachment.[7] Rule B does not define the term "tangible or intangible personal property." Significantly, the rule provides no guidance as to what type of property interest is attachable. OSA urges us to rule that a party must own property for it to be subject to attachment under Rule B, contending that it did not own the bunkers at the time of attachment because it had not yet paid for them. Predictably, Malin counters that an interest in property less than full ownership—here, OSA's agreement to purchase the bunkers coupled with its possession of the bunkers—suffices.

The Supreme Court approved of maritime attachment in *Manro v. Almeida*.[8] Although the Court did not define what constitutes attachable property, it quoted "a book of respectable authority" which states that goods or ships may be attached in the hands of the owner or in the hands of "all others who claim any *right or title* to them . . . ."[9] More than one hundred years later, in *Kingston Dry Dock Co. v. Lake Champlain Transportation Co.*,[10] Judge Learned Hand, writing for the Second Circuit, applied Rule B's precursor and held that a conditional buyer's "conditional right to title" constituted an attachable interest. There, the plaintiff attached two canal boats possessed by the defendant, a conditional buyer. The defendant had contracted for the construction and sale of the boats and had taken possession of them. The contract, however, reserved title to the seller until it received final payment,

---

[7] *See Jaldhi*, 585 F.3d at 69 ("As a remedy *quasi in rem*, the validity of a Rule B attachment depends entirely on the determination that the *res* at issue is the property of the defendant at the moment the *res* is attached.").

[8] 23 U.S. (10 Wheat) 473 (1825).

[9] *Id.* at 491–92 (quoting Hall, CLERKE'S PRAXIS part 2, tit. 28) (emphasis added).

[10] 31 F.2d 265, 267 (2d. Cir. 1929).

and the defendant had not made payment at the time of attachment. On this basis, the defendant sought to vacate the writ of attachment. Recognizing that possession "is historically the original source of all title," Judge Hand warned that "[i]t would be curious if possession, coupled with a conditional right to title, could now be thought insufficient to support a seizure."[11] Accordingly, that court declined to vacate the attachment.

Later, the Third Circuit in *McGahern v. Koppers Coal Co.* distinguished *Kingston* when considering whether a bareboat charterer possessed an attachable interested in the chartered vessel.[12] The court held that a bareboat charterer holds no attachable interest in the chartered vessel because the charterer has "no title or expectancy or possibility of title, conditional or otherwise."[13] Significantly, under a bareboat charter, "[n]o title passes to the charterer under it, but merely the right to possess and control it for a limited period."[14] The Third Circuit found this result "in entire accord" with *Kingston*: "Clearly the conditional vendee [in *Kingston*], while not the holder of the legal title, did have conditional right to title, . . . which was sufficient to support the seizure. . . . In the present case, on the other hand, respondent . . . had no title or expectancy or possibility of title, conditional or otherwise."[15]

Although these cases recognized the principle that a conditional right to title may support attachment under Rule B, a more recent unpublished Fourth Circuit opinion adopted a narrower approach. In *Wave Maker Shipping Co., Ltd. v. Hawksphere Shipping Co. Ltd.*,[16] creditors sought to attach a charterer's

---

[11] *Id.* at 266–67.

[12] 108 F.2d 652 (3d Cir. 1940).

[13] *Id.* at 653.

[14] *Id.*

[15] *Id.*

[16] 56 F. App'x 594 (4th Cir. 2003) (unpublished).

fuel bunkers. Relevantly, the charterer had purchased fuel from a fuel supplier, but had not yet paid for it.[17] Under the contract between the charterer and the fuel supplier, the supplier retained title to the fuel until the charterer paid in full.[18] The charterer contended that the attachment should have been vacated because it did not have title to the fuel; rather, the fuel supplier retained title. Examining whether the Rule B attachment of the fuel bunkers should have been vacated, the Fourth Circuit asked whether the charterer "ever acquired title to the bunkers."[19] In answering this question, the Fourth Circuit relied on principles of English law, which governed the contract at issue.[20] Concluding that the fuel supplier had retained title to the bunkers, the Fourth Circuit vacated the attachment of the fuel in possession of the charterer.[21]

The Second Circuit recently emphasized the importance of ownership in determining whether an interest is attachable under Rule B. In deciding whether electronic fund transfers ("EFTs") are an attachable interest under Rule B, the Second Circuit, relying on New York state law, held that they are not: "Because EFTs in the temporary possession of an intermediary bank are not property of either the originator or the beneficiary under New York law, they cannot be subject to attachment under Rule B."[22] This is because "[f]or maritime attachments under Rule B . . . the question of ownership is critical."[23]

Several district courts have found an attachable property interest under Rule B when the defendant's interest does not rise to ownership. For example,

---

[17] *Id.* at 597.
[18] *Id.*
[19] *Id.* at 598.
[20] *Id.* at 598–99.
[21] *Id.* at 599.
[22] *Jaldhi*, 585 F.3d at 71.
[23] *Id.* at 69.

in *World Fuel Services, Inc. v. SE Shipping Lines Pte., Ltd.*,[24] the district court upheld an attachment of fuel bunkers in the possession of the defendant. Although the defendant had not acquired title to the bunkers, the district court upheld the attachment because the defendant had the right to possess the bunkers, use the bunkers, and sell the bunkers.[25] Similarly, the district court in *Alaska Reefer Management LLC v. Network Shipping Ltd.* stated that "Rule B provides for a broad definition of property and does not require actual ownership or title."[26] That district court held that an attachable interest exists under Rule B when the "assets are being held 'for the benefit of' the Defendant or 'in its name.'"[27]

The body of federal maritime jurisprudence presents ambiguity as to whether, as the district court held here, a possessory interest is attachable under Rule B. Neither does federal maritime law categorize the type of interest that OSA held in the fuel bunkers at the time of the attachment. Confronted with such a void, other courts "generally look to state law to determine property rights."[28] Stated differently, "the precedent in federal admiralty law is so thin that we should turn to state law more directly on point."[29] We choose to do so here in the absence of guiding federal maritime law. In doing so, we are in accord with the closest circuit case, *Wave Maker Shipping Co.*, which

---

[24] No. 10-4605, 2011 WL 446653 (E.D. La. Feb. 4, 2011).

[25] *Id.* at *1–2.

[26] 68 F. Supp. 3d 383, 386–87 (S.D.N.Y. 2014).

[27] *Id.* at 387.

[28] *Jaldhi*, 585 F.3d at 70.

[29] *Reibor Int'l Ltd. v. Cargo Carriers (KACZ-CO.) Ltd.*, 759 F.2d 262, 266 (2d Cir. 1985) ("In short, we agree with the district court that the precedent in federal admiralty law is so thin that we should turn to state law more directly on point. We clearly have this option where we find it appropriate.").

looked to the law governing the contract in determining whether title to fuel bunkers had passed.[30]

At the district court, Cal Dive contended that Texas law governs this issue. The bareboat charter agreement specifies that Texas law applies when federal maritime law is silent. An amendment to the agreement, effective shortly before the instant attachment, specifies that Mexican law applies. Neither party directed us to this amendment or urged us or the district court to apply Mexican law. Under Federal Rule of Civil Procedure 44.1, "[a] party who intends to raise an issue about a foreign country's law must give notice by a pleading or other writing."[31] And "[i]n the absence of sufficient proof to establish with reasonable certainty the substance of the foreign principles of law, the modern view is that the law of the forum should be applied."[32] We therefore look to Texas law.

OSA and GOC executed the bareboat charter agreement on September 12, 2012. The agreement provides that OSA "shall purchase the bunkers" at the time of delivery: "At the time of delivery the Charterers shall purchase the bunkers . . . in the said Vessel at the then current market price at the port of delivery." OSA took delivery of the M/V KESTREL (and consequently its bunkers) on October 15, 2012. Malin attached the fuel bunkers aboard the M/V KESTREL on October 29, 2012. As of October 31, 2012, OSA had neither paid

---

[30] *Wave Maker Shipping Co.*, 56 F. App'x at 598–99 (applying English law in determining whether title to fuel bunkers passed).

[31] FED. R. CIV. P. 44.1.

[32] *Symonette Shipyards, Ltd. v. Clark*, 365 F.2d 464, 468 n.5 (5th Cir. 1966); *see also Karim v. Finch Shipping Co., Ltd.*, 265 F.3d 258, 272 (5th Cir. 2001) ("When the parties have failed to conclusively establish foreign law, a court is entitled to look to its own forum's law in order to fill any gaps." (quoting *Banco de Credito Indus., S.A. v. Tesoreria Gen.*, 990 F.2d 827, 836 (5th Cir. 1993)); *Carey v. Bahama Cruise Lines*, 864 F.2d 201, 206 (1st Cir. 1988) ("By their silence, the litigants[] consent to having their dispute resolved according to the law of the forum.").

No. 15-40463

for nor received an invoice for the bunkers. Our task is to determine the nature of the property interest OSA held in the fuel bunkers at the time of attachment.

Texas has adopted Article 2 of the Uniform Commercial Code, which governs the sale of goods. Relevant here, Article 2 specifies that "title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods . . . ."[33] When "the contract requires delivery at destination, title passes on tender there."[34] Were we to apply Article 2, we would conclude that title passed to OSA on delivery of the M/V KESTREL and its fuel bunkers to OSA. Here, however, OSA's obligation to purchase the bunkers did not arise from a contract for the sale of goods, but from the bareboat charter agreement.[35] As Article 2 is thus inapplicable, we apply principles of Texas common law.

Under Texas common law, the instant at which title to personal property passes from seller to buyer depends on the parties' intent.[36] Generally, if the contract does not condition passage of title on payment, a seller passes title to a buyer on delivery of the goods.[37] But, "where the contract of sale of personal property calls for cash on delivery, concurrent payment upon delivery is

---

[33] TEX. BUS. & COM. CODE ANN. § 2.401(b); *see also Crocker Nat'l Bank v. Ideco Div. of Dresser Indus., Inc.*, 839 F.2d 1104, 1107 (5th Cir. 1988) ("Unless otherwise explicitly agreed, title to goods generally passes to the buyer when the seller completes his performance with reference to physical delivery of the goods.").

[34] *Id.* § 2.401(b)(2).

[35] *See Neubros Corp. v. Nw. Nat'l Ins. Co.*, 359 F. Supp. 310, 319 (E.D.N.Y. 1972) ("For the purposes of the Uniform Commercial Code a bareboat charter for a period of eighteen months is not a sale as defined in sections 2-102, 2-105(1) and 2-106(1) of the Code.").

[36] *John E. Morrison & Co. v. Murff*, 212 S.W. 212, 214 (Tex. Civ. App.—Galveston 1919, no writ) ("Moreover, the intention of the parties themselves, to be ascertained from their express declaration, or from the circumstances presented, or both, is the dominating consideration in determining whether or not title has passed in the sale of a chattel.").

[37] *See, e.g.*, *Luse v. Crispin Co.*, 344 S.W.2d 926, 930 (Tex. App.—Houston 1961, writ ref'd n.r.e.).

essential to pass the title . . . ."[38] The former is a credit sale; the latter is a cash sale.[39]

The instant agreement specifies that OSA "shall purchase the bunkers" at the time of delivery. Although Cal Dive asserted in the district court that this language indicates that the parties contemplated a cash sale under which OSA would not obtain title until payment, this interpretation goes too far. "Purchase" means "[t]he acquisition of an interest in real or personal property by sale . . . ."[40] And a "sale" may occur based on either an actual payment or a mere promise to make payment.[41] The parties' agreement uses the word "purchase," so it does not necessarily indicate that they intended that OSA make payment before title would pass. Moreover, the agreement is silent as to when payment was due or when title would pass.

In addition, OSA's and Cal Dive's representations throughout this litigation show that Cal Dive did not expect OSA to remit payment for the bunkers at the time of delivery. Both parties have consistently represented that, as of the time of attachment on October 29, 2012, OSA had neither received an invoice for the fuel bunkers nor been asked to pay for them. OSA maintains that this confirms that it never obtained title to the bunkers. We disagree: It shows that OSA was not expected to pay for the bunkers at the time of delivery. Thus, under Texas law, the parties contemplated a credit transaction. Further, there is no evidence in the record indicating that OSA

---

[38] *Id.* ("A cash sale is one in which the contract calls for payment of the price in cash when the contract is made or the goods are delivered.").

[39] *See id.*

[40] *Purchase*, BLACK'S LAW DICTIONARY (10th ed. 2014).

[41] The acquisition of an interest in property "by sale" does not necessarily require payment. *See Sale*, BLACK'S LAW DICTIONARY (10th ed. 2014) (defining the four elements of a sale as "(1) parties competent to contract, (2) mutual assent, (3) a thing capable of being transferred, and (4) a price in money paid *or promised*" (emphasis added)).

and Cal Dive intended to delay the passage of title to the bunkers until OSA remitted full payment.[42] We conclude that, under Texas law, title to the bunkers passed to OSA on delivery.

Under this analysis, OSA received title to the bunkers on October 15, 2012, the day that it took possession of the M/V KESTREL. Malin attached those bunkers on October 29, 2012. Because OSA held title to the bunkers at the time of Malin's attachment—and title to property unquestionably suffices as an attachable interest under Rule B—we affirm the district court's denial of OSA's motion to vacate the attachment.

## B. Summary Judgment

Having confirmed that the district court had personal jurisdiction over OSA by virtue of the attachment of the bunkers on the vessel that it had chartered, we turn to OSA's challenges to the district court's summary judgment in favor of Malin. We review the district court's summary judgment de novo, applying the same standards as the district court.[43]

In his Report and Recommendation on Malin's motion for summary judgment, the magistrate judge found the following facts to be undisputed: (1)

---

[42] *Compare Luse*, 344 S.W. at 929–30 ("Although Williams testified that the sale was a cash sale, the evidence clearly shows that the purchase price was not to be paid by Transcontintental upon delivery of the pipe at Beaumont, but was to be paid upon receipt of Crispin's invoice in Oklahoma. There was no agreement between the parties that payment should be made before or concurrently with delivery of the pipe at Beaumont. There was no agreement that delivery of the pipe was to be delayed until the purchase price was paid. It was contemplated that delivery should precede the payment of the purchase price."), *and John E. Morrison & Co.*, 212 S.W. at 213 ("There is an utter absence throughout the entire body of evidence of any intimation even that full payment in cash of the balance of the purchase price before removal of the car, or in the alternative the giving of a note therefor, were made or understood to be conditions precedent to completion of the contract of sale, or that they were part and parcel of it."), *with Sinker, Davis & Co. v. Comparet*, 62 Tex. 470, 474 (1884) ("The machinery was sold and delivered to Comparet under an express stipulation that the vendors parted with no title, nor was any acquired by Comparet, until payment was made of the price agreed to be paid as evidenced by the notes given by the purchaser.").

[43] *Ashford v. United States*, 511. F.3d 501, 504 (5th Cir. 2007).

Con-Dive represented to Malin that it was acting for and with the permission of OSA when it arranged for the work and services; (2) Malin performed the work and provided the services; (3) through Con-Dive, an OSA employee furnished instructions and directions for Malin's work; (4) Malin periodically invoiced OSA for the work; (5) these invoices contained the terms and conditions of the contracts, including provisions for the collection of service charges and attorney's fees; (6) OSA, through an employee, promised to pay the overdue invoices; (7) OSA did nothing within any reasonably relevant time to disaffirm Con-Dive's authority or Malin's work; and (8) OSA retained all of the benefits of Malin's work. On that record, the magistrate judge recommended finding that OSA ratified Malin's work and invoices and is liable to Malin for payment. The magistrate judge recommended finding in the alternative that OSA is liable for the payment of Malin's invoices on the basis of quantum meruit. The magistrate judge also recommended that Malin be awarded attorneys fees on the basis of its ratification theory, but not on its quantum meruit theory. The district court adopted these findings and entered judgment in favor of Malin.

OSA contends that the district court erred in holding that OSA ratified the contractual obligations of Malin's customer, Con-Dive. Texas law provides that "if a party acts in a manner that recognizes the validity of a contract with full knowledge of the material terms of the contract, the party has ratified the contract and may not later withdraw its ratification and seek to avoid the contract."[44]

---

[44] *Advanced Nano Coatings, Inc. v. Hanafin*, 478 F. App'x 838, 843–44 (5th Cir. 2012) (unpublished) (quoting *Verizon Corp. Servs. Corp. v. Kan-Pak Sys., Inc.*, 290 S.W.3d 899, 906 (Tex. App.—Amarillo 2009, no pet.)).

OSA initially contends that Malin failed to show that its services benefited OSA. Whether Malin's services benefited OSA, however, has no bearing on Malin's ratification theory. Demonstrating that a party accepted benefits under a contract is one way to show ratification, but it is not the only way.[45] Malin proved that its invoices were ratified by OSA when OSA agreed to pay them after receiving them. Even if we were to accept OSA's contention that Malin did not show that OSA benefited from its services, the result would not change.

OSA next contends that the presence of an issue of fact as to whether Con-Dive acted as Malin's agent should have precluded summary judgment on Malin's ratification theory. But an agency relationship is not required to uphold the district court's ruling that OSA ratified Con-Dive's acts.[46]

OSA finally contends that Malin failed to show that OSA ratified the invoices' provisions on interest and attorneys fees. On an undisputed record, the magistrate judge found that Malin invoiced OSA for its services and that "the invoices contained the terms and conditions of the contracts, including the provisions for the collection of service charges and attorney's fees . . . ." Malin

---

[45] *See United States v. McBride*, 571 F. Supp. 596, 612–13 (S.D. Tex. 1983) ("Ratification may be manifested in one or more of several ways: a party may ratify, first, by intentionally accepting benefits under the contract; second, by remaining silent or acquiescing in the contract for a period of time after he has the opportunity to avoid it; and third, by recognizing [the] validity of the contract by acting upon it, performing under it, or affirmatively acknowledging it.").

[46] *See McWhorter v. Sheller*, 993 S.W.2d 781, 787 (Tex. App.—Houston [14th Dist.] 1999, pet. denied) ("Most case law interpreting the doctrine of ratification couches its discussion in the context of an existing agency relationship where the agent exceeds the scope of her authority and the principal later accepts the benefits of such act after acquiring full knowledge. Ratification, however, can occur outside this general paradigm. While most cases will fall within the context of an agency relationship, such a relation is not necessary to cause the ratification to be effective. It is true, however, that because ratification is not a form of authorization, the ratification of an act of a stranger will not create an agency relationship, it will only bind the ratifier to the specific transaction that is ratified." (citations omitted)).

supplied an affidavit from Gabe Socias, a superintendent at Malin, who testified that "Malin and Oceanografia/Con-Dive agreed to the provision of certain work and services . . . *pursuant to the terms of Malin's invoices*." Socias further testified that "[t]he invoices attached are true and correct copies of the originals and accurately reflect the work and services provided by Malin to Oceanografia and Con-Dive." Each invoice includes two parts: (1) a basic invoice, dated at various times in 2008, which reflected the invoice number, date, services rendered, and amount due; and (2) a formal invoice, reflecting, *inter alia*, the original invoice date, the total amount invoiced, the interest due as of February 10, 2009, and the interest and attorneys fees provisions.[47] Socias also attached a June 9, 2009, e-mail from an OSA representative confirming the receipt of Malin's "overdue" invoices.

On appeal, OSA tries to inject ambiguity into the summary judgment record by asserting that there is no evidence that OSA received the formal invoices containing the interest and attorneys fees provisions. It follows, argues OSA, that the evidence does not prove that it ratified the interest and attorneys fees provisions of the invoices.

We note that OSA proffered no summary judgment evidence to show that it did not receive the relevant invoices. By contrast, the unrefuted summary judgment evidence, as established by Socias's affidavit, proves that (1) OSA agreed to Malin's provision of services and work *pursuant to Malin's invoices*, and (2) the attached invoices are the "true and correct copies of the originals . . . ." In addition, the June 9, 2009, e-mail from OSA's representative confirms OSA's receipt of the "overdue" invoice statements and OSA's

---

[47] The record provides no indication of why all the formal invoices specify the interest accrued as of February 10, 2009. We can only speculate that Malin printed the invoices on this date.

agreement to pay the invoices. We must assume that, if OSA had evidence to create an issue of fact to preclude summary judgment, it would have supplied it.[48] We therefore affirm the district court's determination that no material issues of fact exist as to whether OSA received and ratified the invoices, including their interest and attorneys fees provisions. The district court committed no error in granting summary judgment for Malin.

## III.

## CONCLUSION

We affirm the district court's denial of OSA's and Cal Dive's motions to vacate the attachment, and we affirm the district court's summary judgment in favor of Malin.

AFFIRMED.

---

[48] OSA supplied an out-of-time declaration from Gustavo Azcarate—the OSA representative who received Malin's invoices via e-mail. Azcarate's declaration, however, goes only to whether Con-Dive acted as an agent for OSA and says nothing to refute the evidence demonstrating that OSA, through Azcarate, received Malin's invoices.