**REVISED August 20, 2018**

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 16-11802

United States Court of Appeals
Fifth Circuit

**FILED**
August 17, 2018

Lyle W. Cayce
Clerk

PLAINSCAPITAL BANK,

Plaintiff - Appellant

v.

KELLER INDEPENDENT SCHOOL DISTRICT,

Defendant - Appellee

Appeals from the United States District Court
for the Northern District of Texas
USDC No. 4:10-CV-926

Before OWEN, SOUTHWICK, and WILLETT, Circuit Judges.

PER CURIAM:*

A baby boy sustained massive brain damage from a tainted vaccine. Over a decade later, his guardian and trustee sued the school district where he was enrolled for discrimination in violation of the Americans with Disabilities Act and the Rehabilitation Act. The district court granted judgment as a

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 16-11802

matter of law to the school district after finding that the evidence did not show intentional discrimination.  We AFFIRM.

## FACTUAL AND PROCEDURAL BACKGROUND

When a tainted vaccine left him with life-altering brain damage at four months old, Terrence C. Rideau (known as "T.R." or "Little T")[1] became a qualified individual under the Americans with Disabilities Act ("ADA") and the Rehabilitation Act ("RA").  He suffers from encephalopathy, which is a brain disease.  He is unable to speak, feed himself, or dress himself; he wears a diaper.  Along with seizures, he suffers from dystonia, which is a physical ailment that causes his muscles to tense and his body to stiffen.

In 2001, after litigation against the vaccine manufacturer concluded in a settlement, T.R. became the beneficiary of a guardianship management trust that would provide for his lifelong care.  The trust, which was funded by the proceeds of the settlement, was established to provide for T.R.'s health, education, support, and maintenance. This includes medical treatment, therapy, equipment, and caregivers.  The trustee and guardian of T.R.'s estate is the plaintiff, PlainsCapital Bank.

In 2002, Breggett and Terrence Rideau, T.R.'s mother and father, enrolled T.R. at Keller Independent School District ("Keller" or "Keller ISD"). Keller had a reputation as having one of the best special education programs in the area for disabled children.  T.R.'s teacher at Keller was Dan Evans, an instructor with a master's degree in special education and nearly two decades of experience teaching disabled students.  Evans taught a classroom with all severely disabled students.  The classroom was fairly visible to those on the outside because an entire wall of the classroom was glass.  Two para-professionals worked with Evans in T.R.'s classroom, and other adults

---

[1] T.R. was 15 years old when this case was filed in district court in 2010.

No. 16-11802

frequently visited the classroom to provide therapy sessions to individual students.  T.R. was seven years old when he enrolled at Keller.

Initially, the Rideaus trusted Evans, inviting him to attend T.R.'s birthday parties and hiring him as T.R.'s babysitter.  The record does not indicate that the Rideaus complained about Evans's treatment of T.R. for several years.  From 2006 through 2010, however, several incidents occurred that the Rideaus later alleged were because Evans intentionally mistreated T.R.  These incidents included T.R.'s first episode of dystonia, multiple knee injuries, a head bump, a broken thumb, and an emergency visit to the hospital when T.R. was screaming in pain.

In December 2010, the Rideaus sued Keller, alleging violations of Title II of the ADA and Section 504 of the RA.  At the 2013 trial, the Rideaus argued that T.R. was denied, among other things, the benefits of a safe school environment and of physical and occupational therapy.  Keller argued that there was no evidence of intentional discrimination or deliberate indifference.  After a two-week trial, the jury returned a verdict in favor of the Rideaus.  Shortly thereafter, Keller moved to dismiss, arguing that the Rideaus lacked standing to sue as T.R.'s next friends because PlainsCapital as his trustee was the proper plaintiff.  The Rideaus filed a motion, asking the court "to permit PlainsCapital to ratify the Rideaus' actions in prosecuting T.R.'s federal claims against [Keller]."  The court granted Keller's motion, denied the Rideaus' motion, and entered judgment in favor of Keller.

On appeal, we affirmed the dismissal of the Rideaus' individual mental anguish claims, vacated the judgment in Keller's favor, and reversed the denial of PlainsCapital's motion to ratify.  *Rideau v. Keller Indep. Sch. Dist.*, 819 F.3d 155, 170 (5th Cir. 2016).  On remand, the district court almost immediately entered a judgment on the jury verdict.  Keller then renewed its motion for a judgment as a matter of law.  In a lengthy opinion, the district court granted

3

No. 16-11802

the motion because of insufficient evidence of deliberate indifference. It alternatively conditionally granted Keller's motion for a new trial. The plaintiff timely appealed.

## DISCUSSION

The standard of review of a ruling on a Rule 50(a) motion for judgment as a matter of law ("JMOL") is *de novo*. *Montano v. Orange Cnty.*, 842 F.3d 865, 873 (5th Cir. 2016). We review a JMOL using the same standard as the district court, viewing all the evidence and reasonable inferences in the light most favorable to the nonmovant. *Id.* A decision granting the JMOL should be affirmed if "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." *Id.* (quoting *Williams v. Hampton*, 797 F.3d 276, 282 (5th Cir. 2015)). There is a legally sufficient evidentiary basis for a jury's verdict if reasonable, fair-minded, and impartial jurors could reach different conclusions. *Delano-Pyle v. Victoria Cnty.*, 302 F.3d 567, 572 (5th Cir. 2002).

On appeal, the plaintiff argues that the grant of a JMOL was error because there was sufficient evidence that T.R. suffered discrimination based on his disability and that Keller was legally responsible. It also argues error in the conditional grant of a new trial, an issue we do not address in light of our conclusion that there was no error in granting a JMOL.

We divide our discussion of the plaintiff's arguments on the JMOL in two. First, we discuss the legal theory that went to the jury, namely, that Keller's responses to numerous acts of mistreatment reflected deliberate indifference. We then turn to the theory that Keller was vicariously liable for the teacher's intentional acts. The district court had held pretrial that vicarious liability was an applicable basis for liability in this case, then over objection it refused to give an explicit instruction on that theory to the jury.

4

No. 16-11802

## I. *Deliberate Indifference*

To recover under either Section 504 of the RA or Title II of the ADA on a claim of disability-based intentional discrimination by a public entity, a plaintiff must prove: (1) he is a qualified individual with a disability; (2) he is being denied the benefits of a public entity's services, programs, or activities, or otherwise suffers intentional discrimination by the entity; and (3) the discrimination or denial of benefits was because of his disability. *Doe v. Columbia-Brazoria Indep. Sch. Dist. by & through Bd. of Trs.*, 855 F.3d 681, 690 (5th Cir. 2017). Judicial precedents concerning either Section 504 of the RA or Title II of the ADA generally apply to the other. *Id.* The parties agree that T.R. is a qualified individual with a disability. They disagree as to whether the factual record supports liability for deliberate indifference.

The following instructions to the jury explained deliberate indifference:

> Defendant Keller ISD is not responsible or liable for the alleged mistreatment of Little T by Dan Evans or other employees of Keller ISD on account of Little T's disability unless Plaintiffs prove by a preponderance of the evidence that:
>
> First: Little T was intentionally discriminated against because of his disability by Dan Evans or other employees of Keller ISD by subjecting him to mistreatment in Keller ISD's programs, services, or activities;
>
> Second: This alleged mistreatment was so severe, pervasive, and objectively offensive that it effectively deprived Little T of the educational programs, services, or activities provided by Keller ISD;
>
> Third: Defendant Keller ISD had actual knowledge of the alleged mistreatment by Dan Evans or other employees of Keller ISD because of Little T's disability; . . .
>
> Fourth: Defendant Keller ISD acted with deliberate indifference to such known mistreatment by Dan Evans or other Keller ISD employees.

The third and fourth instruction required Keller to have actual knowledge and to be deliberately indifferent. There is no dispute here about the instructions.

5

No. 16-11802

As we have already discussed, our *de novo* standard of review requires that all evidence and any reasonable inferences be viewed in the light most favorable to the party whose jury verdict was overturned.  Review of a jury verdict by an appellate court is to be "especially deferential." *EEOC v. Boh Bros. Constr. Co.*, 731 F.3d 444, 451 (5th Cir. 2013) (en banc) (citation omitted). "Judgment as a matter of law is appropriate where there is no legally sufficient evidence upon which the jury could find for a party on its claim." *Carmona v. Sw. Airlines Co.*, 604 F.3d 848, 855 (5th Cir. 2010).  The evidence is sufficient if reasonable, fair-minded, and impartial jurors could reach different conclusions. *Delano-Pyle*, 302 F.3d at 572.

We now examine the evidence.  This is a large record with many witnesses.  To guide our discussion, we rely on what the plaintiff has argued in its appellate briefing to show how it believes the district court erred.  The plaintiff identifies several incidents that it argues show the district court misapplied the deliberate-indifference standard to Keller's treatment of T.R.

First, the plaintiff argues that Keller had actual knowledge as of April 17, 2008, that Evans abusively mistreated T.R.  On that day, a meeting occurred between Principal Taylor and Rebecca Bruton, who was Evans's classroom aide at the time. There, Bruton expressed concerns with how Evans treated T.R.  In its appellate brief, the plaintiff argues that "[a]cknowledging that the administration had actual knowledge of Evans's abuse then . . . , the district court wrongly sidestepped the devastating substance of what the administration learned from Ms. Bruton's notes."  This argument mischaracterizes the district court's opinion by omitting a critical qualifier.  The district court wrote: "It is undisputed that Keller acquired actual knowledge of Evans's *alleged* mistreatment of T.R. at this meeting." (emphasis added).  The trial transcript does not support the plaintiff's framing of this

issue. In her testimony at trial, Bruton herself admitted she did not think Evans "ever acted to intentionally harm any child."

Moreover, the plaintiff argues that in this meeting Bruton expressed the "devastating substance" of how Evans was abusive towards T.R. Though viewing the evidence with great deference to the jury's verdict, a reasonable factfinder could not agree with the plaintiff's characterization. At trial, Bruton explained the meeting. On direct examination, she testified Evans "yanked" T.R.'s gait belt and "kicked" T.R.'s foot, which caused her to express her concerns about Evans with Keller. Under cross examination, though, Bruton admitted she did not observe any reaction of pain following the "yank" and that by "kicking" she meant that Evans used his foot to move T.R.

Bruton's concerns were not sufficient to provide Keller with actual knowledge that one of its employees was abusing a student. Bruton's concerns also are insufficient to support the jury's finding of "mistreatment so severe, pervasive, and objectively offensive that it effectively deprived Little T of education programs, services, or activities provided by Keller."

The second grouping of evidence the plaintiff wants us to consider concerns Keller's response to hearing Bruton's descriptions of Evans's treatment of T.R. The plaintiff characterizes the evidence heard by the jury as "credible evidence that Keller ISD did absolutely nothing more after writing a file memo and giving Evans a 'slap on the wrist.'" The evidence admitted at trial, however, showed that Keller's response was more than that. Based on the April 17 meeting, Principal Taylor understood Bruton to be expressing concerns about roughness, not abuse. If indeed Bruton thought Evans's actions were abusive, then she was required to report the abuse to Child Protective Services ("CPS"), not just the administration. Bruton testified that she did not report any of Evans's conduct to CPS, and in her meeting with Taylor she did not refer to any of Evans's conduct as abuse.

No. 16-11802

Taylor testified that she understood the report to be that Evans was rough with students, which in her nearly four decades of teaching experience occurred most often during physical therapy sessions. In responding to a report that Evans was "rough" with students, Taylor questioned T.R.'s therapist and discussed if Keller was "on target with where [it] need[ed] to be with his physical therapy." She also instructed Evans to be careful in handling students. After investigating and concluding that there was no evidence of abuse, Taylor made a note in Evans's file and monitored his classroom more closely. At trial, the plaintiff did not impeach Taylor's testimony in any way — there was nothing to suggest her recollection was deficient or that her testimony was untrue. No reasonable factfinder could conclude that questioning T.R.'s therapist, questioning Evans and instructing him not to be so rough, documenting what occurred, and then continuing to monitor after receiving a report of roughness was deliberate indifference.

Third, the plaintiff has us examine the evidence of what occurred at year end, when "the outgoing administration chose to remain silent about the abuse in Evans's classroom." The plaintiff, though, fails to include a single citation to evidence in the record that would have enabled the jury to reach this conclusion. We have already found that there was no evidence to support that Keller had actual knowledge about abuse occurring in Evans's classroom. Bruton did not consider it abuse. Taylor did not consider it abuse. The jury also heard, without any objection from plaintiff, that CPS investigated what happened in Evans's classroom and Evans was pleased that the letter from CPS cleared him of any wrongdoing. If abuse did not occur, then a reasonable factfinder could not conclude that remaining silent constituted intentional discrimination. The evidence fails to show abuse occurred.

Fourth, the plaintiff argues that there was sufficient evidence that Keller knew that Evans "routinely dropped" T.R. by failing to follow the protocols for

8

lifting the child, causing injury.  By itself, Evans's failure to follow an internal policy requiring two-person lifts is not evidence of intentional discrimination. Analogously, violating a school's administrative requirements is not enough to allow damages under Title IX.  *See, e.g., Gebser v. Lago Vista Indep. Sch. Dist.,* 524 U.S. 274, 292 (1998).  In addition, we agree with the district court's conclusion that Keller did not have actual knowledge or notice that Evans was mistreating T.R.  The evidence presented to the jury does not support a finding that Keller was on notice that Evans was abusive towards T.R.

Beyond what is argued in the plaintiff's brief, there is evidence about the onset of dystonia, multiple knee injuries, a head bump, and a broken thumb. It is unclear from the record if T.R. was at Keller when he received his first knee injury in May 2009.  T.R.'s doctors both testified that T.R. had not regressed during his time at Keller.  In addition, the doctors testified that the onset of dystonia was not triggered by physical or sexual abuse: "Dystonia is characteristic of brain dysfunction in the parts of the brain that control movement. . . . Dystonia is involuntary."  Bruton admitted at trial that, although she thought it was disrespectful, Evans's actions did not physically harm T.R.

Furthermore, the record does not support that Keller caused the bump or knot on T.R.'s head.  The medical records admitted at trial stated that T.R.'s injury was likely caused by an insect bite; any other explanation was purely speculative.  Similarly, the record does not indicate that Evans or Keller was responsible for T.R.'s broken thumb.  In her investigation, Keller's principal was unable to determine what caused the injury even after she "spoke to both the paraprofessionals, to the teacher, OT/PT, occupational therapist, physical therapist, the nurse, [and] anybody that had been in the classroom."  Finally, the record does not indicate that T.R.'s second knee injury was because of Evans's or Keller's action.  None of the medical personnel who evaluated T.R.

observed a knee injury. Instead, the record supports that T.R. was constipated, received treatment, and recovered before his knee injury was discovered.

The evidence does not support a factual link between T.R.'s injuries and any action or inaction by Keller that qualifies as intentional discrimination. For many of the injuries, the record does not show that Keller or any of its employees were responsible at all. Applying the same evidentiary standard as did the district court, we find no error in the grant of a JMOL insofar as evidence of deliberate indifference is concerned.

*II. Vicarious Liability*[2]

Our description of the evidence on deliberate indifference also reveals there is principally only speculation that Evans himself acted wrongfully. Nonetheless, instead of evaluating what fact findings jurors could make, we resolve arguments about vicarious liability on the basis of procedural default.

In denying summary judgment before trial, the district court concluded that under the ADA and the RA, Keller could be vicariously liable for the intentionally discriminatory acts of its employees. The court relied on our decision in *Delano-Pyle*, where we held that "under either the ADA or the RA, the public entity is liable for the vicarious acts of any of its employees as specifically provided by the ADA." 302 F.3d at 574–75 (emphasis omitted). We had also held that "[t]here is no 'deliberate indifference' standard applicable to public entities for purposes of the ADA or the RA. . . . [T]o receive compensatory damages for violations of the Acts, a plaintiff must show intentional discrimination." *Id.* at 575. Applying both of those propositions, *Delano-Pyle* concluded the county was vicariously liable when a police officer arrested a hearing-disabled man but did not provide any accommodation despite notice

---

[2] The plaintiff at times refers to "respondeat superior" liability, but we will use the term of the caselaw we discuss, which is "vicarious liability."

that the arrestee likely was not understanding oral communication. *Id.* at 576. Neither a policymaker nor an official policy was required; liability could arise from an employee's intentional acts. *See id.*

Keller has argued that the 2002 *Delano-Pyle* opinion reached the wrong conclusion by failing to apply prior and contrary decisions by the United States Supreme Court.[3] The persuasiveness of arguments that one of our precedents is wrong is usually irrelevant due to this circuit tenet: "It is a well-settled Fifth Circuit rule of orderliness that one panel of our court may not overturn another panel's decision, absent an intervening change in the law, such as by a statutory amendment, or the Supreme Court, or our en banc court." *Jacobs v. Nat'l Drug Intelligence Ctr.*, 548 F.3d 375, 378 (5th Cir. 2008). Keller, though, refers us to a decision that after declaring a clear conflict between one of our precedents and a Supreme Court opinion predating the precedent, applied the Supreme Court's analysis. *Wilson v. Taylor*, 658 F.2d 1021, 1034–35 (5th Cir. Unit B 1981).[4] The *Wilson* court said the prior panel opinion "did not mention [the earlier Supreme Court opinion], and we have examined the briefs and

---

[3] *See Barnes v. Gorman*, 536 U.S. 181, 185 (2002) (applying Title IX analysis to Title II and Section 504 claims and requiring proof of intentional discrimination for damages); *Davis by Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 646–47 (1999) (holding that a school district could be liable under Title IX for peer-on-peer harassment if the school had actual notice and responded with deliberate indifference); *Gebser*, 524 U.S. at 277 (requiring proof of actual notice and deliberate indifference before a school district is liable under Title IX for a teacher's sexual harassment of a student).

[4] Among the plaintiff's criticisms of *Wilson* is that it was issued by a Unit B Fifth Circuit panel. We thus describe such panels. Beginning in May 1980, in anticipation of the split of the six-state Fifth Circuit that finally occurred on October 1, 1981, all judges and cases from the eastern three states (the future 11th Circuit) were assigned to Unit B panels, while all the western states' judges and cases were assigned to Unit A panels. Robert A. Ainsworth Jr., *Fifth Circuit Court of Appeals Reorganization Act of 1980*, 1981 BYU L. REV. 523, 524 n.6 (1981). *Wilson*, a Florida case, was submitted to a Unit B panel. A decade later, this court finally addressed the effect of such opinions: "We now squarely hold that all Unit B cases are precedent in the Fifth Circuit." *United States v. Rojas-Martinez*, 968 F.3d 415, 420 n.11 (5th Cir. 1992). *Wilson*'s precedential value thus is unspoiled by its Unit B origin.

ascertained that [the Court's opinion] was not called to the attention of the []
panel." *Id.* at 1035. This orderliness caveat has not developed much of a
following in the Fifth Circuit, largely one hopes because its premise of a panel
and parties who all fail to identify controlling Supreme Court authority is rare.
Regardless, we will explain why there is no need for us to follow it here.

Relying on *Delano-Pyle*, PlainsCapital offered a jury instruction that
would inform jurors of vicarious liability:

> Under the Rehabilitation Act and ADA, a public entity, such
> as Keller ISD, is liable for the vicarious acts of any of its employees.
> This means that Keller ISD is liable for any of its employees'
> wrongful acts so long as the wrongful act or acts were committed
> in the course of the employees' employment.

Keller objected and offered alternatives. When the district court finalized the
instructions, no instruction referring explicitly to vicarious liability was given.
Plaintiff's counsel at a hearing made two objections. First, counsel argued that
Keller could be held vicariously liable under the ADA and RA "and all we need
to do is show that an employee of Keller ISD discriminated against Little T
and, thereby, either excluded him from participating in or denied him the
benefits of a service, activity, or program or, otherwise, discriminated against
Little T because of his disability." Second, counsel objected to the requirement
that the plaintiff needed to show "knowledge of Keller ISD or deliberate
indifference as those standards only apply to student on student harassment."
Both objections were overruled.

On appeal, though, the plaintiff does not argue that the district court
should have granted an additional or different instruction on vicarious
liability. Indeed, the plaintiff indicates the jury instructions did present the
necessary standard to jurors, "the jury made the requisite findings for such
[vicarious] liability, and judgment should alternatively have been entered on

that basis." The referenced "findings" must be those on the verdict form, where jurors answered "yes" to each of the following questions:

1. Was Little T intentionally discriminated against because of his disability by Dan Evans or other employees of Keller ISD by subjecting him to mistreatment in Keller ISD's programs, services, or activities?

2. Was the mistreatment so severe, pervasive, and objectively offensive that it effectively deprived Little T of educational programs, services, or activities provided by Keller ISD?

3. Did Keller ISD have actual knowledge of the mistreatment by Dan Evans or other employees of Keller ISD because of Little T's disability?

4. Did Keller ISD act with deliberate indifference to such known mistreatment by Dan Evans or other employees of Keller ISD?

5. Did Keller ISD intentionally discriminate against Little T because of Little T's disability by its actions or failure to act in response to its knowledge that Dan Evans or other employees of Keller ISD were intentionally mistreating Little T because of his disability?

In summary, the plaintiff's argument is that affirmative answers to several of these questions that were intended to explain the elements of the deliberate indifference standard of liability constitute findings on the separate legal standard of vicarious liability. To emphasize the law as it was argued to the district court, we repeat part of our earlier quote of plaintiff's offered but rejected instruction on vicarious liability: "Keller ISD is liable for any of its employees' wrongful acts so long as the wrongful act or acts were committed in the course of the employees' employment." The only relevant employee was Evans, and the intentional acts under plaintiff's theory would have to amount to Evans, because of T.R.'s disability, denying the child the benefits of the services, programs, or activities of the school. *Delano-Pyle*, 302 F. 3d at 574.

We start our analysis of this issue with identifying our standard of review. To set the stage for the identification, we remind that the jury verdict

13

was in favor of the plaintiff, reflected in jurors' answers to interrogatories on deliberate indifference.  After an initial appeal and remand, a JMOL was granted because the district court found a lack of evidence of the school district's knowledge of its employee's possibly abusive conduct. The response to the motion for a JMOL was the time for the plaintiff to argue that, regardless of the evidence of Keller's knowledge, there was sufficient evidence to support vicarious liability and, further, that affirmative answers were given to correct jury interrogatories on that theory.  The arguments were not made.  Yes, the plaintiff argued there was sufficient evidence of Evans's intentional acts, but the district court was never informed of this argument that the jury had already decided the issue of vicarious liability.   That argument was particularly necessary because of the inconsistent argument made during trial that it was error not to give an instruction on vicarious liability.

We characterize this new issue as a legal argument not presented to the district court in response to the dispositive motion for a JMOL.   We have held that plain-error review applies when the movant for a JMOL did not include a separate legal issue in its motion and wanted to raise it for the first time on appeal. *See Navigant Consulting, Inc. v. Wilkinson*, 508 F.3d 277, 292 (5th Cir. 2007).  The same rule should apply when the party trying to preserve a verdict raises a new legal basis on appeal to set aside the grant of the JMOL.

For plain error, the party seeking reversal must show there was: "(1) 'error,' (2) that is 'plain,' and (3) that 'affect[s] substantial rights.'" *Holmes v. Tex. A & M Univ.*, 145 F.3d 681, 685 (5th Cir. 1998) (quoting *Johnson v. United States*, 520 U.S. 461, 467 (1997)).  If those factors are satisfied, then we may exercise our discretion to correct an error that undermines the fairness, integrity, or public reputation of judicial proceedings. *Id.*  The newly asserted error is that sufficient instructions and interrogatories to support vicarious

liability were submitted to the jury, and therefore it was error to grant a JMOL by considering only the evidence regarding deliberate indifference.

The legal issues that must be decided are at least these: (a) what must be included in jury instructions for vicarious liability in this context, (b) did the instructions and interrogatories given on deliberate indifference, containing additional elements not relevant to vicarious liability, present the vicarious liability theory to jurors, and (c) if so, may a jury verdict be upheld on a theory not presented to jurors if the elements of that theory are a subset of those in a set of interrogatories given to the jury?  The factual issue is simply whether there is some evidence in the record to support vicarious liability.

On the key legal issues, plaintiff has provided little briefing. In its opening brief, it repeated the factual argument made in district court when opposing the JMOL, namely, that Evans's discriminatory intent was clearly established. It did not, though, offer any legal support for the proposition that the district court could use that evidence to conclude the jury already had made findings on vicarious liability.  The plaintiff here also reargues *Delano-Pyle* and says the jury interrogatory on Evans's intent is comparable to what was proven about the police officer in that precedent.  Yet, there is no citation to any caselaw that would allow the district court or this court to use that interrogatory to impose liability under a new theory.

Whatever may be the merits of the argument that some of the findings on deliberate indifference should be transformed into findings on vicarious liability, plaintiff has given us little argument and no authority to support it. Failure to provide meaningful briefing on an issue constitutes a waiver.  *See Malin Int'l Ship Repair & Drydock, Inc. v. Oceanografia, S.A. de C.V.*, 817 F.3d 241, 244 n.2 (5th Cir. 2016).  This issue was waived.

We need not reach the issue of whether *Delano-Pyle* is vulnerable to arguments about overlooked Supreme Court authority.  AFFIRMED.